FILED

2018 May-23  PM 03:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR

# THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA; and | ) | Civil Action No. |
| | ) | |
| Morris J. Brooks, Jr., | ) | |
| Representative for Alabama's 5th | ) | |
| Congressional District | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF COMMERCE; and WILBUR L. | ) | |
| ROSS, in his official capacity as | ) | |
| Secretary of Commerce | ) | |
| | ) | |
| BUREAU OF THE CENSUS, an | ) | |
| agency within the United States | ) | |
| Department of Commerce; and RON S. | ) | |
| JARMIN, in his capacity as performing | ) | |
| the non-exclusive functions and duties | ) | |
| of the Director of the U.S. Census Bureau | ) | |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT FOR DECLARATORY RELIEF

## INTRODUCTION

1.      Because of Defendants' unlawful decision to include illegal aliens[1] in the census

figures used for determining the apportionment of the House of Representatives and Electoral

College votes, Plaintiff the State of Alabama stands to lose one congressional seat and one electoral

vote in the reapportionment conducted pursuant to the 2020 Census.  The Final 2020 Census

---

[1] As used herein, "illegal aliens" is defined to mean persons who are present in the United States by virtue of either illegal entry in violation of federal immigration statutes or who have entered the United States legally but have remained present in the country beyond the period of time permitted by federal law.

1

Residence Criteria and Residence Situations Rule promulgated by the United States Census Bureau ("Census Bureau") on February 8, 2018, provides that foreign nationals living in the United States will be counted in the census and allocated to the state where their "usual residence" is located—regardless of whether they are legally present in the United States. Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525 (February 8, 2018) (to be codified at 15 C.F.R. Ch. I) ("Residence Rule"). As a result, the congressional and electoral apportionment predicated on the 2020 census numbers will re-allocate a congressional seat and an electoral vote from the State of Alabama to a state with a larger illegal alien population.

2.      The Residence Rule violates Section 2 of the Fourteenth Amendment to the United States Constitution and the constitutional principle of equal representation by robbing the people of the State of Alabama of their rightful share of political representation while systematically redistributing political power to states with high numbers of illegal aliens and their citizens. For much the same reasons, the Residence Rule violates Article II, § 1 of the United States Constitution by necessitating an unconstitutional distribution of Electoral College votes among the states.

3.      The Residence Rule breaches the federal government's constitutional obligation to conduct an "actual Enumeration" of the number of "persons in each State." The phrase "persons in each State" was understood at both the Founding and in the Reconstruction era to be restricted to aliens who have been lawfully admitted to the body politic constituted by the Constitution. Aliens who are unlawfully present in the United States did not qualify because they are not entitled to political representation. U.S. Const. art. 1, § 2, cl. 3. Thus, the actual enumeration of the population of the states cannot include such aliens.

4.      This suit challenges the Defendants' unconstitutional and arbitrary decision to include illegal aliens in the census numbers utilized for calculating congressional and electoral

2

apportionment.  Plaintiffs seek a declaratory judgment that the Residence Rule is unconstitutional because an apportionment of members of the House of Representatives and Electoral College votes among the states based on population figures which include illegal aliens would violate § 2 of the Fourteenth Amendment, Article I, § 2's requirement of an "actual Enumeration" of the population of the United States, and Article II, § 1 of the United States Constitution.

5.      Finally, Plaintiffs seek a declaration that the Residence Rule violates the Administrative Procedures Act, 5 U.S.C. § 706(2), ("APA") because it is both arbitrary and capricious and exceeds the statutory authority of the Department of Commerce and the Census Bureau.  The Residence Rule is arbitrary and capricious because the Defendants failed to give any explanation of their decision to incorporate illegal aliens into the putative apportionment base or meaningfully respond to comments calling for the exclusion of illegal aliens from the population totals.  And properly interpreted, 13 U.S.C. § 141 and 2 U.S.C. § 2a—the statutes governing the conduct of the census and congressional apportionment—require a census enumeration of the total of legally present resident population of the United States and an apportionment of congressional seats and electoral votes predicated on that count.  By including illegal aliens in the total population of each state and enabling an apportionment based on that population base, the Residence Rule violates these statutes.

## JURISDICTION AND VENUE

6.      The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201(a) because this action arises under U.S. Constitution, amend. XIV, § 2, U.S. Constitution, art. I, § 2, U.S. Constitution, Art. II, § 1, and the APA, 5 U.S.C. § 706.  This Court also has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

7.      Declaratory relief is sought as authorized under 28 U.S.C. § 2201 and the APA, 5 U.S.C. § 706.

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.  Plaintiffs are residents of this judicial district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

9.      Plaintiffs bring this action to redress harms to their proprietary and sovereign interests and as to their interests as *parens patriae*.

## THE PARTIES

1.      Plaintiff the State of Alabama, represented by and through its Attorney General Steve Marshall, is a sovereign state in the United States of America.  The State of Alabama has a cognizable interest in its own right in representation in the House of Representatives and the Electoral College, which is integral to the state's power within the federal system.

2.      Plaintiff Morris J. "Mo" Brooks, Jr., is a member of the United States House of Representatives.  He represents Alabama's 5th Congressional District and is a registered voter in the State of Alabama.   The Congressional district he represents will be disrupted by a reapportionment that accounts for illegal aliens and his vote will be diluted.

3.      Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).   The Commerce Department is responsible for planning, designing, and implementing the 2020 Census.  13 U.S.C. § 4.

4.      Defendant Wilbur L. Ross, Jr., is the Secretary of Commerce.  He is responsible for conducting decennial censuses of the population, and oversees the Bureau of the Census ("Census Bureau").   The Census Bureau is the agency responsible for planning and administering the decennial census.  He is sued in his official capacity.

5.      Defendant Census Bureau is an agency within, and under the jurisdiction of, the Department of Commerce.  13 U.S.C. § 2.  The Census Bureau is the agency responsible for planning and administering the decennial census.

6.      Defendant Ron S. Jarmin is currently performing the non-exclusive functions and duties of the Director of the Census Bureau.  He is sued in his official capacity.

## ALLEGATIONS

I.      **Defendants have a constitutional obligation to conduct the census in a manner that assures fair representation of the States.**

7.      The Census Clause of the United States Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers," U.S. Const. art. I, § 2, cl. 3, which requires "counting the whole number of persons in each State." *Id.* amend. XIV, § 2.  To ensure fair representation among the states, the Constitution requires that this count of the population of each state consist in an "actual Enumeration" of the number of "persons" in each state conducted every ten years "in such manner as [Congress] shall by law direct." *Id.* art. I, § 2, cl. 3.

8.      The same enumeration determines the number of electors in the Electoral College to which each state is entitled.  The Constitution provides that each state is entitled to "a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled to in Congress." U.S. Const. art. II, § 1, cl. 2.  The Electors "shall meet in their respective States, and vote by ballot for President and Vice-President." *Id.* amend. XII.  Thus, taken together with each state's entitlement to two Senators, the Census enumeration determines the number of Presidential electors to which each state is entitled by determining the size of each state's congressional delegation.

9.      Congress has delegated the responsibility to conduct the required enumeration to the Secretary of Commerce.  Under the statute governing the conduct of the census, the Secretary of Commerce "shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year."  13 U.S.C. § 141(a).  The statute further provides that "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States."  *Id.* § 141(b).

10.     The Secretary is authorized to delegate authority to establish procedures to conduct the census to the Census Bureau.  13 U.S.C. §§ 2, 4.

11.     The core constitutional purpose of the Census Bureau and the Department of Commerce in taking the decennial census is to conduct an accurate enumeration of the people of the United States so they are adequately represented in Congress and in Presidential elections.

12.     To enable a person-by-person count, the Census Bureau sends a questionnaire to every household in the United States.  The questionnaires are directed to every resident in the United States and residents are legally required to respond.  13 U.S.C. § 221.  The Census Bureau then counts responses from every household to determine the population of the states.

13.     After the decennial census is conducted by the Census Bureau and the Secretary of Commerce reports the tabulation of the population of the states to the President, the President must "transmit to the Congress a statement showing the whole number of persons in each State excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives."  2 U.S.C. § 2a(a).

14.     Under 2 U.S.C. § 2a(b), "[e]ach State shall be entitled, in the Eighty-third Congress and in each Congress thereafter until the taking effect of a reapportionment under this section or subsequent statute, to the number of Representatives shown in the statement required by subsection (a) of this section, no State to receive less than one Member."

15.     Within 15 days after the receipt of the President's statement, the Clerk of the United States House of Representatives must "send to the executive of each State a certificate of the number of Representatives to which such State is entitled."  2 U.S.C. § 2a(b).

**II.     The Residence Rule will require the incorporation of illegal aliens into the apportionment base used for assigning seats in the House of Representatives and the Electoral College.**

16.     The apportionment population of a state generally is defined to include a state's resident population plus all the state's military and civilian personnel of the federal government and their dependents who are abroad on April 1 of the census year.

17.     The resident population of a state is comprised of all persons counted in the Census—including all illegal aliens who either mail their Census form back or whose presence in the United States was recorded by a Census Bureau employee in an interview.  A person qualifies as a state resident if he meets the Census Bureau's definition of "usual residence," which includes anyone who has a U.S. residence "where they live and sleep most of the time."  Residence Rule, 83 Fed. Reg. 5525, at 5526.

18.     Census Bureau regulations governing the conduct of the 2020 Census explicitly require the incorporation of the illegal alien population of the United States into the count of the total population of the states used by the President in calculating the number of representatives and electoral votes to which each state is entitled.  Under the Final 2020 Census Residence Criteria and Residence Situations rule, "[c]itizens of foreign countries living in the United States" are

"[c]ounted at the U.S. residence where they live and sleep most of the time." Residence Rule 83 Fed. Reg. 5525, at 5533.

19.     Citizens of foreign countries are counted in the census tally used for apportionment purposes regardless of whether they are legal permanent residents of the United States. The Census Bureau received a comment on the 2020 Residence Rule that explicitly raised the issue of counting illegal aliens in the Census.

20.     The Secretary of Commerce will utilize the estimates of the total number of persons in each state compiled by the Census Bureau in discharging his statutory duty to prepare a "tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States" for the President of the United States. 13 U.S.C. § 141(b). In accordance with the criteria set forth in the Residence Rule, this tabulation will include the illegal alien population of each state.

21.     The President will necessarily rely on the estimates delivered by the Secretary of Commerce in determining the number of congressional seats to which each state is entitled. The President is required by law to "transmit to the Congress a statement showing the whole number of persons in each State excluding Indians not taxed, *as ascertained under the seventeenth and each subsequent decennial census of the population*." 2 U.S.C. § 2a(a) (emphasis added). Thus, the President has no authority to base an apportionment on any alternative tally of the population of each state.

22.     To the extent that the President has authority to unilaterally alter the tabulation of the population of each state delivered by the Secretary of Commerce, he will not be able to alter this tabulation to exclude illegal aliens from the apportionment base so long as the Residence Rule remains in effect.

23.     There is no plausible method by which the President could unilaterally alter the report delivered by the Secretary of Commerce to exclude illegal aliens from the tally of the population of each state used for congressional and electoral apportionment.

24.     On March 29, 2018, Defendants announced their decision to ask a question regarding citizenship status on the 2020 Census.[2]

25.     But neither the Department of Commerce nor the Census Bureau has announced a decision to add a question to determine whether a Census respondent and his dependents have legal permanent resident status in the United States, and the Residence Rule explicitly rejects such a criterion of enumeration.

26.     In the absence of information regarding the legal status of persons enumerated in the census, there is no method by which the President would reasonably be able to reliably determine which Census respondents are legally present as residents in the United States or exclude them from the apportionment calculation he is obligated by statute to certify to Congress.

27.     The Clerk of the House of Representatives is bound by law to issue a statement to the executives of each state reflecting the President's determination of the number of seats in the House of Representatives to which each state is entitled.  2 U.S.C. § 2a(b).  Thus, the final act required by statute to complete the apportionment process will be based on an enumeration of the population of each state that includes illegal aliens.

28.     Accordingly, the Residence Rule's criteria for determining the population of each state will ultimately determine the apportionment of the House of Representatives and the Electoral College.

---

[2] U.S. Census Bureau, *Questions Planned for the 2020 Census and American Community Survey* 1 (Mar. 2018).

**III.     Including illegal aliens in the apportionment base has repeatedly redistributed congressional seats and Electoral College votes from states with low numbers of illegal aliens to states with high numbers of illegal aliens.**

29.     For the past three decades, the United States has been undergoing the largest wave of immigration in American history.  By the end of the 1990s, at least 1.5 million immigrants were arriving in the United States per year.  These rates have been relatively stable since then.  In 2016, the Department of Homeland Security determined that an estimated 1.1 million persons were granted legal permanent resident status in the United States, up from 1 million in 2015 and 2014.[3] By contrast, immigration to the United States in the Ellis Island migration wave peaked at about 800,000 persons per year between 1900 and 1909.[4]  Prior to the present immigration wave, the Ellis Island wave was the largest migration in United States history.

30.     Illegal immigrants make up a substantial component of the American immigrant population.  The Department of Homeland Security estimates that at least 11.59 million illegal aliens resided in the United States in 2010 and at least 11.4 million illegal aliens lived in the United States in 2012.[5]  These numbers are mirrored by other estimates.  Pew Research Center estimates that roughly 11.1 million illegal aliens resided in the United States in 2014.[6]  The Center for Migration Studies estimates that more than 11 million illegal aliens resided in the United States in 2015.[7]

---

[3] U.S. Department of Homeland Security, "Persons Obtaining Lawful Permanent Resident Status: Fiscal Years 1820 to 2016" (Dec. 2017), *available at* https://www.dhs.gov/immigration-statistics/yearbook/2016/table1.
[4] George J. Borjas, *We Wanted Workers: Unraveling the Immigration Narrative* 52 (2016).
[5] Bryan Baker & Nancy Rythina, U.S. Department of Homeland Security, "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012," at 5 tbl. 3 (Mar. 2013), *available at* https://www.dhs.gov/sites/default/files/publications/ois_ill_pe_2012_2.pdf.
[6] Jeffrey S. Passel & D'Vera Cohn, Pew Research Center, "Overall Number of U.S. Unauthorized Immigrants Holds Steady Since 2009," *available at* http://www.pewhispanic.org/2016/09/20/overall-number-of-u-s-unauthorized-immigrants-holds-steady-since-2009/ (Sept. 2016).
[7] Center for Migration Studies, "State-Level Unauthorized Population and Eligible-to-Naturalize Estimates," *available at* http://data.cmsny.org/ (2016).

31.     In previous censuses, the Census Bureau failed to exclude illegal aliens from the enumeration of the number of persons in each state.  Apportionment was based on the total resident population of each state—including illegal aliens—relative to the other states in the United States.

32.     The reapportionment of House seats and electoral votes is a zero sum proposition: Each state's gain is another state's loss.  There are 435 members of the House of Representatives.  That number has been fixed by statute since 1910.  *See* 2 U.S.C. § 2a(a) (refers to "the then existing number" of members, which was 435 when the statute was adopted).  Thus, every decennial census redistributes 435 seats among the states.

33.     Illegal immigration impacts the distribution of seats in the House of Representatives and the Electoral College because the United States' illegal alien population is both large and highly concentrated.  If the illegal alien population were evenly distributed among the states, incorporating illegal aliens in the apportionment base would have no impact on the distribution of House seats.

34.     But in 2000, two-thirds of the foreign born who indicated on the Census that they have lived in the United States for more than 20 years still lived in just six states.[8]

35.     According to Immigration and Naturalization Service estimates, one out of every two illegal aliens lived in just three states in the year 2000.[9]

---

[8] Dudley L. Poston, Jr., Steven A. Camarota, & Amanda K. Baumle, *Remaking the Political Landscape: The Impact of Illegal and Legal Immigration on Congressional Apportionment, Center for Immigration Studies*, https://cis.org/Report/Remaking-Political-Landscape (Oct. 2003).
[9] *Id.*

36.    Department of Homeland Security estimates for the year 2010 concluded that over 61 percent of illegal aliens lived in just six states in that year.[10]  73 percent of illegal aliens lived in only 10 states.[11]

37.    Defendants' practice of including illegal aliens in the Census has repeatedly resulted in the unlawful distribution of additional House seats and electoral votes to states with high numbers of illegal aliens from states with low numbers of illegal aliens, depriving those states and their citizens of their rightful share of representation and political power.

38.    Illegal immigration not only redistributes seats in the House of Representatives, it also has the same effect on Presidential elections because the number of electors in the Electoral College to which a state is entitled is determined by the size of its congressional delegation.

39.    The Immigration and Naturalization Service (INS) estimated that almost 7 million illegal aliens were counted in the 2000 Census.[12]

40.    According to the Department of Homeland Security, 11.59 million illegal aliens were counted in the 2010 Census.[13]

41.    There is no reason to believe that illegal aliens will not respond to the 2020 Census in significant numbers and at a similar rate.

42.    The presence of illegal aliens in the 2000 Census caused Indiana, Michigan, and Mississippi to each lose one seat in the House and one vote in the Electoral College in 2000, while

---

[10] Bryan Baker and Nancy Rythina, "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012," U.S. Department of Homeland Security,
https://www.dhs.gov/sites/default/files/publications/ois_ill_pe_2012_2.pdf (Mar. 2013).
[11] *Id.*
[12] Dudley L. Poston, Jr., Steven A. Camarota, & Amanda K. Baumle, *Remaking the Political Landscape: The Impact of Illegal and Legal Immigration on Congressional Apportionment, Center for Immigration Studies*, https://cis.org/Report/Remaking-Political-Landscape (Oct. 2003).
[13] Bryan Baker and Nancy Rythina, "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012," U.S. Department of Homeland Security,
https://www.dhs.gov/sites/default/files/publications/ois_ill_pe_2012_2.pdf (Mar. 2013).

Montana failed to gain a seat in the House and an Electoral College vote it otherwise would have gained.[14]  California gained three seats due to the inclusion of illegal aliens in the 2000 Census, and North Carolina gained one seat.[15]  Thus, four House seats and four Electoral College votes were redistributed by the inclusion of illegal aliens in the apportionment base in the 2000 Census.

43.     In the 2000 apportionment, 12 congressional seats and Electoral College votes changed hands.  Thus, the effects of including illegal aliens in the 2000 Census accounted for one-fourth of the total change by redistributing three seats from Indiana, Michigan, and Mississippi. The incorporation of illegal aliens in the apportionment base also prevented one seat from changing hands that otherwise would have, by preventing Montana from gaining a seat it would have been entitled to under an apportionment that excluded illegal aliens from the population base considered.

44.     In the 2010 Census, including illegal aliens in the congressional and electoral apportionment base once again redistributed political power from states with low numbers of illegal aliens to states with high numbers of illegal aliens.

45.     In the apportionment that followed the 2010 Census, Louisiana, Missouri, and Ohio each lost one seat in the House of Representatives and one vote in the Electoral College.[16]  Montana once again failed to gain a seat and an electoral vote that it would have gained had illegal aliens been excluded from the apportionment base.  By contrast, California gained 2 seats and electoral votes that it would not have had if illegal aliens had been excluded from the apportionment base,

---

[14] Dudley L. Poston, Jr., Steven A. Camarota, & Amanda K. Baumle, *Remaking the Political Landscape: The Impact of Illegal and Legal Immigration on Congressional Apportionment, Center for Immigration Studies*, https://cis.org/Report/Remaking-Political-Landscape (Oct. 2003).
[15] *Id*.
[16] Steven A. Camarota, *Shifting the Balance: How the Gang of Eight bill and Immigration generally shifts seats in the House of Representatives*, Center for Immigration Studies, https://cis.org/sites/default/files/camarota-house-re-apportionment.pdf (Nov. 2013).

and Florida and Texas gained one congressional seat and one electoral vote each to which they would not otherwise have been entitled.[17]

46.     Citizens and legal residents of states with low illegal alien populations lose representation as a consequence of including illegal aliens in the apportionment base.  But illegal aliens do not benefit from this practice because they cannot vote or generally take part in the political process.  Instead, the gains from including illegal aliens in the apportionment base flow to citizens who live in states with large numbers of illegal aliens.  In a state in which a large share of the population cannot vote, those who do vote count more than those who live in states where a larger share of the population is made up of American citizens.  Counting large illegal alien populations in the census appropriates voting power from Americans and bestows it on other Americans.

47.     In the states that lost seats due to immigration in 2010, 96 percent of the voting-age population were citizens, in contrast to 86 percent in the states that gained seats.  In the states that lost seats due to immigration in 2010, the average district had 543,243 voting age citizens, compared to only 449,553 in the states that gained seats.[18]

48.     Including illegal aliens in the apportionment base compromises the right to equal representation.  The redistribution caused by illegal immigration tends to take representation away from states comprised mostly of United States citizens and permanent legal residents and redistribute that representation to states where many residents are not legal residents of the United States.  In states granted more seats due to their high illegal alien population, representatives and electors will represent a smaller number of constituents than their counterparts in states with low numbers of illegal aliens.

---

[17] *Id.*
[18] *Id.*

49.     The redistribution of political power caused by including illegal immigrants in the apportionment base disincentivizes states with large illegal alien populations from cooperating with federal immigration authorities (lest they lose political power that comes with additional representatives and votes in the Electoral College) and punishes states who do cooperate with federal immigration authorities in the identification and removal of aliens who are not lawfully present in the United States.

IV.     **Defendants' decision to include illegal aliens in the census population count for purposes of apportionment will rob the State of Alabama and its legal residents of their rightful share of representation.**

50.     Incorporating illegal aliens into the population count utilized for apportionment will likely result in the State of Alabama losing a seat in the House of Representatives and a vote in the Electoral College.

51.     The effects of illegal immigration on congressional and electoral apportionment can be accurately measured by removing the estimated illegal alien population from each state's projected total population and recalculating the allocation of seats in the House of Representatives using the method of equal proportions.

52.     The method of equal proportions has been used in every census conducted since the 1940 census. *See U.S. Dept. of Commerce v. Montana*, 503 U.S. 442 (1992).

53.     The Census Bureau offers a detailed explanation of how the method of equal proportions operates.[19]

54.     Use of the method of equal proportions in apportionment is required by statute. 2 U.S.C. § 2a(a) (number of representatives to which each state is entitled shall be determined "by the method known as the method of equal proportions.").

---

[19] *See* United States Census Bureau, *Computing Apportionment*, https://www.census.gov/population/apportionment/about/computing.html (last updated February 4, 2013).

55.     Alabama currently has 7 seats in the House of Representatives and 9 Electoral College votes.

56.     If illegal immigrants are included in the apportionment population for the 2020 Census, the size of Alabama's congressional delegation will fall to 6 seats in the House of Representatives.

57.     For the same reason, Alabama's number of votes in the Electoral College will fall to 8 electoral votes as a result of the 2020 apportionment if illegal aliens are counted in the apportionment base and allocated to the states where they have their usual residence.

58.     But if illegal aliens are excluded, from the 2020 Census population figures used for apportionment, Alabama will retain its 7 seats in the House of Representatives.

59.     If illegal aliens are excluded from the count of the population in the 2020 Census, Alabama will retain its 9 votes in the Electoral College.

60.     Ohio will likely lose a congressional seat and an electoral vote due to the inclusion of illegal aliens in the 2020 Census.  Ohio also lost a seat and an electoral vote because of the inclusion of illegal aliens in the 2010 Census.

61.     As in the 2000 and 2010 Censuses, Montana will not gain a congressional seat and an electoral vote that it would have gained if illegal aliens were excluded from the 2020 Census and the apportionment base.

62.     As a result of the inclusion of illegal aliens in the 2020 Census, both Arizona and Texas will likely gain one congressional seat and one electoral vote.

63.     California will avoid losing one congressional seat and electoral vote that it would have lost if illegal aliens were excluded from the 2020 Census.

64.     This will deprive Alabama and its legal residents of equal representation in the House of Representatives and the Electoral College because illegal aliens are not entitled to representation in either body.

65.     The average estimate of the total legal resident population of Alabama in 2020 is 4,863,279. This means that if illegal aliens are included in the 2020 Census and Alabama's House delegation is reduced to six members, an Alabama congressional representative will represent 810,546 constituents on average.

66.     The average estimate of the total legal resident population of Arizona in 2020 is 7,010,144. This means that an Arizona congressional representative will represent 701,014 constituents on average if illegal aliens are not excluded from the apportionment base.

67.     The average estimate of the total legal resident population of Texas in 2020 is 28,007,401. That means that a Texas congressional representative will represent 718,138 constituents on average if illegal aliens are not excluded from the apportionment base.

68.     The average estimate of the total legal resident population of California in 2020 is 38,123,406. That means that a California congressional representative will represent 719,309 constituents on average if illegal aliens are not excluded from the apportionment base.

69.     Thus, while the average Alabama representative will represent 810,546 constituents, the average representative from a state that gains or does not lose a seat due to the inclusion of illegal aliens in the Census will represent 712,820 constituents—a difference of 97,726 constituents.

70.     By contrast, if illegal aliens are excluded from the apportionment base, an Alabama representative will represent 694,754 constituents on average. Representatives from Arizona,

Texas, and California will represent on average 778,904, 737,036, and 747,517 constituents, respectively.

71.     While the average Alabama representative will represent 694,754 constituents if illegal aliens are excluded from the apportionment base, the average representative from a state that gains or does not lose a seat due to the inclusion of illegal aliens in the Census will represent 754,486 constituents if illegal aliens are excluded from the apportionment base—a difference of 56,060 constituents.

72.     This means that excluding illegal aliens from the apportionment base will reduce representational inequality between Alabama and the states that gain from the inclusion of illegal aliens in the census by approximately 41,666 constituents per congressional representative.  This is a reduction of representational inequality by 42.6 percent.

## V.     Defendants' decision to include illegal aliens in the Census enumeration will likely cause the State of Alabama to lose federal and private funding.

73.     Counting illegal aliens in the Census will jeopardize critical federal funding needed by states to provide services to millions of legal residents.

74.     Many federal programs rely on the population figures collected in the decennial census to allocate funds to state and local governments.  Approximately $700 billion is distributed annually to nearly 300 different census-guided federal grant and funding programs.  Including illegal aliens in the 2020 Census enumeration will harm Plaintiff the State of Alabama and its legal residents by depriving them of their fair share of federal funding.

75.     For example, the Highway Trust Fund provides grants to states for road construction and other surface transportation programs, which are calculated on the basis of local population estimates collected through the decennial census.  23 U.S.C. § 104(d)(3).

76.     In fiscal year 2015, Alabama received $756 million in Highway Trust Fund grants.

77.     Under the Urbanized Area Formula Funding program, the Department of Transportation utilized population figures from the most recent decennial census to calculate federal resources allocated to cities and states for planning, operating, and improving transportation. 49 U.S.C. §§ 5307, 5340.

78.     In fiscal year 2017, Alabama received over $23.9 million in Urbanized Area Formula grants.

79.     The Child Care and Development Fund allocates funding based on census information on the number of children below the age of thirteen. 45 C.F.R. § 98.63.

80.     In fiscal year 2015, Alabama received over $42 million in Child Care Development grants.

81.     Because the funds in these programs and other federally-funded programs are allocated-based data collected in the decennial census, Alabama will lose federal funding that it would have received if illegal aliens had been excluded from the census. These funds will be redistributed to states that show a higher population total in the Census than they would have shown if illegal aliens were excluded from the Census enumeration of the population of each state. Losses of funding for these programs will significantly harm the State of Alabama, which will need to either meet these needs through state funding or allow resource needs to go unmet.

82.     An accurate census is necessary to allow both public and private actors to identify and meet community and business needs.

83.     The Department of Commerce estimates that census data guides trillions of dollars in private sector investment and is used to create $221 billion in private sector revenue.

84.     Non-profit organizations use census data to decide where to provide critical aid such as health care and natural disaster relief.  Non-profit organizations also use census data in determining where to conduct fundraising and advocacy drives.

85.     Including illegal aliens in the census enumeration will likely deprive historically disadvantaged communities and low-income communities in Alabama of vital private resources over the next decade by steering those resources to states with higher numbers of illegal aliens.

86.     The State of Alabama will need to expend additional resources to compensate for the loss of vital aid from private actors to their residents, or allow their residents' needs to go unmet.

**VI.     The Residence Rule is Unlawful**

87.     The Residence Rule is unlawful because it violates (1) Section 2 of the Fourteenth Amendment, (2) the Census Clause of Article I, § 2, (3) the Electoral Apportionment Clause of Article II, § 1, (4) § 706(2)(A) of the APA, and (5) § 706(2)(C) of the APA.

**A.   Including illegal aliens in the federal apportionment base violates the Fourteenth Amendment and Article II, § 1.**

88.     The Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed." U.S. Const. amend. XIV, § 2, cl. 1.

89.     This language largely tracks the language of the original Census Clause, which provided that "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. art. I, § 2, cl. 3.

90.     The same calculation dictates the apportionment of electoral votes between the states, excepting those electoral votes that derive from a state's entitlement to representation in the Senate.  Under Article II, Section 1, Clause 2, of the Constitution, "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress."

91.     A rule governing the conduct of the census and apportionment comports with the requirements of these constitutional provisions only if it is "consistent with the constitutional language and the constitutional goal of equal representation." *Franklin*, 505 U.S. at 804.

92.     The Residence Rule promulgated by the Census Bureau does not comport with either of these requirements and is thus unconstitutional.

**1.  Including illegal aliens in the apportionment base is inconsistent with the text of the Fourteenth Amendment because illegal aliens are not "persons in each State" for apportionment purposes.**

93.     Incorporating illegal aliens into the apportionment base is inconsistent with the language of the Fourteenth Amendment's Census Clause because the term "persons in each State" as it occurs in the Census Clause of the Fourteenth Amendment does not refer to any and all natural persons who happen to be present in the United States on census day, but rather only to members of "the people."

94.     The Constitution repeatedly uses the terms "persons" and "the people" interchangeably.  The history and structure of the Constitution indicate that the Fourteenth Amendment Census Clause uses the term "persons" to refer to "members of the people."  As it occurs in the Constitution, the term "the people" refers to persons who are "members of the political community" constituted by the Constitution and the laws of the United States. *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).

95.     Illegal aliens are not members of the political community constituted by the Constitution and thus cannot be counted for apportionment purposes.  While legal immigrants are entitled to virtual political representation because they have been admitted to the political community by the people of the United States, acting through their elected representatives, illegal aliens have not been admitted to the political community and thus are not entitled to representation in Congress or the Electoral College.

96.     Therefore, the Residence Rule violates the Census Clause of the Fourteenth Amendment because it incorporates illegal aliens in the congressional apportionment base.

97.     The Residence Rule will cause the apportionment based on the 2020 census to violate the Fourteenth Amendment by including aliens who should not be counted in the apportionment base under this amendment.

98.     The Residence Rule is inconsistent with Article I, § 2, because the "actual Enumeration" required by that provision includes only those who should be counted for apportionment purposes.  This does not include illegal aliens.

99.     The Residence Rule violates Article II, § 1, of the Constitution because it mandates a distribution of Electoral College electors among the states based on an unconstitutional allocation of congressional seats.

   **2.  Including illegal aliens in the apportionment base is inconsistent with the text of the Fourteenth Amendment because illegal aliens are not inhabitants of the states as that term was understood at the Founding and Reconstruction.**

100.    The Census Clause requires apportionment based on the "number of persons *in each State*."  U.S. Const. amend. XIV, § 2, cl. 1 (emphasis added).

101.    The original Census Clause apportioned representatives "among the several States which may be included within this Union, according to their respective Numbers, which shall be

22

determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. Art. I, § 2, cl. 3.

102.    At both the time of the founding and when the 14th Amendment was ratified, the language of the Census Clause was publicly understood to require an apportionment base comprised of the *inhabitants* of the states.

103.    The drafts of the apportionment provision, including the version initially approved by the Constitutional Convention, used the term "inhabitants" rather than "persons" or "residents." 1 Records of the Federal Convention of 1787 350, 352 (Max Farrand, ed., Yale University Press, 1937) (referring to the "whole number of free citizens and inhabitants, of every age, sex and condition, including those bound to servitude for a term of years, and three fifths of all other persons not comprehended in the foregoing description (except Indians not paying taxes)").

104.    In the public law of the founding era, the term "inhabitant" did not encompass unlawful residents because inhabitancy was a legal status that depended upon permission to settle granted by the sovereign nation in which an alien wished to reside.

105.    Although the language of the original Census Clause omitted the term "inhabitant," this change was not intended as a substantive alteration of the drafting language.  The original public understanding of the Census Clause was that the phrase "whole Number of free Persons" in each state was synonymous with the term "inhabitants," and that term did not encompass unlawful residents.  The "Number" of persons in each state was equivalent to that state's number of inhabitants at the Founding.

106.    When the Census Clause was given its present form by the Fourteenth Amendment, the phrase "whole number of persons in each State" was publicly understood to refer only to legal

inhabitants of the states and did not purport to alter the meaning of the Census Clause so that unlawful residents would be included in the apportionment base.

107.    The phrase "persons in each State" was not understood to mean anything different from the phrase "the whole Number of free Persons" in the original Census Clause.

108.    Thus, the Residence Rule violates the Census Clause of the Fourteenth Amendment because it includes illegal aliens in the apportionment base even though they do not qualify as "inhabitants" of the states under the original understanding of the Constitution.

109.    The Residence Rule is inconsistent with Article I, § 2, because the "actual Enumeration" required by that provision includes only those who constitute "persons in each State" for Fourteenth Amendment purposes.  This phrase does not encompass illegal aliens.

110.    The Residence Rule violates Article II, § 1, of the Constitution because it mandates a distribution of Electoral College votes based on an unconstitutional allocation of congressional seats.

### 3.   Including illegal aliens in the apportionment base is inconsistent with the constitutional goal of equal representation.

111.    Rules governing the conduct of the decennial census and apportionment are constitutional only if they are "consistent with . . . the constitutional goal of equal representation." *Franklin*, 505 U.S. at 804.

112.    The "principle of representational equality" embodied in the Constitution requires "that the voters of each district have the power to elect a representative who represents the same number of constituents as all other representatives."  *Evenwel v. Abbott*, 136 S.Ct. 1120, 1126 (2016).

113.    Illegal aliens are not "constituents" for purposes of the principle of equal representation because they have no legal entitlement to representation in the House of Representatives or the Electoral College.

114.    Representatives and electors do not represent human beings in general or all persons living within the territorial jurisdiction of the United States, but rather the self-governing people of the United States, their descendants, and aliens whom the people of the United States have chosen to admit to the political community created by the Constitution through lawful immigration.  Illegal aliens are not part of this political community, and are thus not entitled to political representation.

115.    Illegal aliens are not "constituents" in the sense comprehended by the principle of equal representation because they have not been admitted to the political community constituted by the United States Constitution.

116.    The Residence Rule violates this principle because including illegal aliens in the apportionment base systematically redistributes congressional seats and electoral votes from states with low numbers of illegal aliens to states with high numbers of illegal aliens.  This results in a situation in which congressional representatives and electors of states with high numbers of illegal aliens represent substantially fewer constituents than representatives and electors from states with low numbers of illegal aliens.

117.    The average Alabama representative will likely represent 810,546 constituents, but the average representative from a state that gains a seat due to the inclusion of illegal aliens in the Census will represent 712,820 constituents—a difference of 97,726 constituents.  But if illegal aliens are excluded from the apportionment base, an Alabama representative will likely represent 694,754 constituents on average and assuming the average estimate of Alabama's legal resident

population in 2020.  Representatives from Arizona, Texas, and California will represent on average 778,904, 737,036, and 747,517 constituents, respectively.

118.    The average Alabama representative will represent 694,754 constituents if illegal aliens are excluded from the apportionment base.  The average representative from a state that gains or does not lose a seat due to the inclusion of illegal aliens in the Census will represent 754,486 constituents if illegal aliens are excluded from the apportionment base—a difference of 56,060 constituents.

119.    Excluding illegal aliens from the apportionment base will likely reduce representational inequality between Alabama and the states that gain from the inclusion of illegal aliens in the census by approximately 41,666 constituents per congressional representative.  This is a reduction of representational inequality by 42.6 percent.

120.    Thus, including illegal aliens in the apportionment base will deprive Alabama and its citizens of their rightful share of political power in both Congress and the Electoral College while unconstitutionally augmenting the political power of states with high numbers of illegal aliens.

121.    Thus, the Residence Rule violates the Fourteenth Amendment because it violates the principle of equal representation enshrined in that amendment.

122.    For the same reason, the Residence Rule violates Article II, § 1, of the Constitution because it mandates a distribution of Electoral College votes based on an allocation of congressional seats that violates the principle of equal representation.

123.    The Residence Rule violates Article I, § 2's requirement that the census constitute an "actual enumeration" of the number of "persons in each State" because it requires an enumeration that violates the principle of equal representation when utilized for its

26

constitutionally-ordained task: Apportionment of the House of Representatives and the Electoral College.

**B. The Residence Rule is unlawful because it is arbitrary and capricious.**

124.    The APA requires this Court to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

125.    In reaching the ultimate decision to allocate illegal aliens to the States, the Defendants had an obligation to "examine the relevant data and articulate a satisfactory explanation for [the] action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  The Residence Rule is arbitrary and capricious under this standard because the Defendants completely failed to give any explanation of their decision to include illegal aliens in the census tabulation of the population of each State that will be used for apportionment purposes.

126.    The Residence Rule is also substantively unreasonable.  *Multicultural Media, Telecom, and Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) ("A substantive unreasonableness claim" contends that "given the facts, the agency exercised its discretion unreasonably.  A decision that the agency's action was substantively unreasonable generally means that, on remand, the agency must exercise its discretion differently and reach a different bottom-line decision.") ("Multicultural Media").  The Census Bureau concedes that the "fundamental reason that the decennial census is conducted is to fulfill the constitutional requirement (Article I, Section 2) to apportion seats in the U.S. House of Representatives among the states." Residence

Rule, 83 Fed. Reg. 5525, at 5526.  The Bureau also concedes that the goal of the enumeration accomplished by the census is a "fair and equitable apportionment." *Id.*  But including illegal aliens in the census count used for apportionment purposes necessarily results in an apportionment that is neither fair nor equitable because it is inconsistent with the principle of equal representation and results in vote dilution.

127.    Defendants "failed to adequately address all of the relevant factors or to adequately explain its exercise of discretion in light of the information before it." *Multicultural Media*, 873 F.3d at 937.  They did not consider the possibility of excluding illegal aliens from the census figures used for apportionment, even though excluding illegal aliens from that count would best comport with their own stated goal of conducting a census that will enable a "fair and equitable apportionment."  Residence Rule, 83 Fed. Reg. 5525, at 5526.

128.    The Census Bureau utterly failed to offer a meaningful and reasoned response to a comment in the rulemaking record that raised the issue presented in this suit. *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010) (remanding to agency for further explanation because it "did not resolve the[ ] commentators' objections" or, at best, "attempt[ed] to address them in a conclusory manner").

129.    The commenter in question "expressed concern about the impact of including undocumented people in the population counts for redistricting because these people cannot vote, and they stated that this practice encourages gerrymandering."  Residence Rule, 83 Fed. Reg. 5525, at 5530.  The Census Bureau's only response to this comment was to assert that this comment was "considered out of scope for this document" by the Census Bureau. *Id.*  The Bureau did not give any substantive response to the comment or even attempt to justify its decision to include illegal aliens within the census tally used for apportionment.  Nor did the Census Bureau offer any

justification for its conclusory assertion that this comment was beyond the scope of the Residence Rule. This failure renders the Residence Rule arbitrary and capricious. *Sierra Club v. Envtl. Prot. Agency*, 863 F.3d 834, 838–39 (D.C. Cir. 2017) (remanding to agency for further explanation because it "failed to respond adequately to comments" that agency argued were outside the scope of its determination).

130.    The Residence Rule creates perverse incentives for states to contravene the enforcement of federal immigration law in order to augment their share of political power and federal funding at the expense of states that cooperate with federal authorities to enforce the immigration laws. As a result, the Residence Rule undermines the enforcement policies present in the federal immigration statutes. This practical incompatibility renders the rule an abuse of discretion.

131.    The Residence Rule is premised on an internally inconsistent and unreasoned reading of the Census Clause and governing statutes. The Residence Rule allocates persons deployed outside the United States on Census Day to the States where they have their usual stateside residence even though they are not physically present in a State on census day and do not currently reside in the United States. This demonstrates that it is a legal connection to a State that determines whether a person should be allocated to a State for apportionment purposes in Defendants' view, not their physical presence in the State or where they currently usually live and sleep. But this allocative criterion is inconsistent with Defendants' decision to allocate illegal aliens to the States where they make their factual residence even though they have no legal entitlement to reside in that State.

132.    For at least these reasons, the Residence Rule violates 5 U.S.C. § 706(2)(A) and must be set aside as unlawful.

**C. The Residence Rule is unlawful because it is in excess of statutory authority.**

133.    The APA requires this Court to hold unlawful and set aside any agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

134.    Under the statute that defines the duties of the Secretary of Commerce with respect to the conduct of the census, the Secretary of Commerce "shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year." 13 U.S.C. § 141(a). It further provides that "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States." *Id.* § 141(b).

135.    Under the constitutional avoidance canon, "federal courts should not construe a statute to create a constitutional question unless there is a clear statement from Congress endorsing this understanding." *Johnson v. Governor of Florida*, 405 F.3d 1214, 1229 (11th Cir. 2005).

136.    Interpreting 13 U.S.C. § 141 to use the term "population" to encompass persons who are unlawfully present within the United States would raise substantial constitutional questions about the validity of that statute under the Section 2 of the Fourteenth Amendment, Article I, § 2, and Article II, § 1. Under that interpretation, the statute would mandate the incorporation of illegal aliens into the apportionment base and thus violate the United States Constitution.

137.    Thus, 13 U.S.C. § 141 should be interpreted to use the term "population" to refer only to the legally present population of the states to avoid these serious constitutional questions.

138.    Under this interpretation of the statute, the Residence Rule exceeds the statutory authority of the Secretary of Commerce and the Census Bureau because it purports to include illegal aliens in the tally of the population of the states designated for use in the apportionment calculation by 13 U.S.C. § 141(b) and 2 U.S.C. § 2a.

139.    Accordingly, the Residence Rule must be held unlawful and set aside under the APA, 5 U.S.C. § 706(2)(C).

## FIRST CAUSE OF ACTION

### Violation of the Fourteenth Amendment (Congressional Apportionment)

140.    The Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

141.    Section 2 of the Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const., amend. XIV.

142.    The Residence Rule will cause the apportionment based on the 2020 census to violate the Fourteenth Amendment by including aliens who should not be counted for the purpose of apportionment, and by effectuating an interstate apportionment that is inconsistent with the constitutional principle of equal representation.  Thus, the Residence Rule violates the Fourteenth Amendment and must be held unconstitutional and set aside.

## SECOND CAUSE OF ACTION

### Violation of the Fourteenth Amendment, Article I, § 2, and Article II, § 1 (Electoral College Apportionment)

143.    The Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

144.    Article II, § 1, provides that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art II, § 1, cl. 2.

31

145.     Because the Residence Rule includes illegal aliens in the tally of the population of the states that is used to apportion the House of Representatives, and the number of House seats a state has is determinative of the number of electoral votes to which a state is entitled, the Residence Rule violates Article II, § 1, by basing the apportionment of electoral votes on a population figure that includes aliens who should not be counted for purposes of apportionment and by violating the principle of equal representation.  Thus, the Residence Rule must be held unconstitutional and set aside.

## THIRD CAUSE OF ACTION

### Violation of Article I, § 2 (Actual Enumeration)

146.     The Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

147.     Article I, § 2 provides that "[t]he actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such manner as they by law direct."  U.S. const., art. I, § 2, cl. 3.  The required "actual Enumeration" must be an enumeration of "the whole number of persons in each State, excluding Indians not taxed."  *Id.*, amend. XIV.

148.     Illegal aliens should not be counted for purposes of the Census Clause and including them in the apportionment base would violate the principle of equal representation.  Therefore, an "actual Enumeration" which incorporates them into the count of the number of persons in each state is constitutionally defective.  This is what the Residence Rule does, which entails that it violates Article I, § 2's requirement of an "actual enumeration" of the number of persons in each state and must be set aside as unconstitutional.

## FOURTH CAUSE OF ACTION

### Violation of the APA (Arbitrary and Capricious)

149.     The Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

150.     The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

151.     The Residence Rule is arbitrary and capricious because the Defendants failed to give any explanation of their decision to incorporate illegal aliens into the putative apportionment base or meaningfully respond to comments calling for the exclusion of illegal aliens from the population totals, and the Rule is substantively unreasonable, self-contradictory, and unprincipled.

152.     Because the Residence Rule is arbitrary and capricious, it violates 5 U.S.C. § 706(2)(A) and must be held unlawful and set aside.

## FIFTH CAUSE OF ACTION

### Violation of the APA (Contrary to Law)

153.     The Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

154.     APA requires this Court to hold unlawful and set aside any agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

155.     Properly interpreted, 13 U.S.C. § 141(b) and 2 U.S.C. § 2a require a census enumeration of the total population of the legally present population of the United States and an apportionment of congressional seats and Electoral College votes predicated on that population base.

156.    The Residence Rule violates this statutory requirement by counting illegal aliens and allocating them to the states where they usually live and sleep.

157.    Because the Residence Rule exceeds the Department of Commerce and the Census Bureau's authority under those statutes and are contrary to their requirements, the Residence Rule violates 5 U.S.C. § 706(2)(C) and must be set aside as unlawful.

## PRAYER FOR RELIEF

158.    Wherefore, the Plaintiffs ask this Court to issue an order and judgment:

a.    Declaring that the Residence Rule is unlawful because it violates (1) Section 2 of the Fourteenth Amendment, (2) the Census Clause of Article I, § 2, (3) the Electoral Apportionment Clause of Article II, § 1, (4) § 706(2)(A) of the APA, and (5) § 706(2)(C) of the APA;

b.    Declaring that any apportionment of the House of Representatives conducted pursuant to 2 U.S.C. § 2a by the Secretary of Commerce that does not use the best available methods to exclude illegal aliens from the population figures utilized to apportion congressional seats and electoral votes among the states would be unconstitutional.

c.    Vacating and setting aside the Residence Rule insofar as it permits or requires the Census Bureau to include illegal aliens in the population figures utilized to conduct the apportionment of the House of Representatives and the Electoral College among the states;

d.    Remanding this case to the Department of Commerce and the Census Bureau, to permit the Defendants to issue rules that comply with the Constitution, the APA, and governing statutes.

e.    Awarding the Plaintiffs such additional relief, including injunctive relief, as the Court deems appropriate.

34

Respectfully submitted,

STEVE MARSHALL
*Alabama Attorney General*

BY:

Eric M. Palmer (ASB-1808-J15R)
*Assistant Solicitor General*

James W. Davis (ASB-4063-I58J)
*Deputy Attorney General*


Winfield J. Sinclair (ASB-1750-S81W)
Brad A. Chynoweth (ASB-0030-S63K)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 WASHINGTON AVENUE
Post Office Box 300152
Montgomery, AL 36130-0152
(334) 353-2196
(334) 123-4567—FAX
Email:  epalmer@ago.state.al.us
          jimdavis@ago.state.al.us
          wsinclair@ago.state.al.us
          bchynoweth@ago.state.al.us

*Counsel for Plaintiff*
*The State of Alabama*

Morris J. Brooks, Jr.
Pro se
2101 W. CLINTON AVE.
Suite 302
Huntsville, AL 35805
(256) 355-9400
(256) 355-9406—FAX

*Counsel for Plaintiff*
*Morris J. Brooks, Jr.*