# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

|  |  |
|---|---|
| STATE OF ALABAMA, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 2:18-cv-00772-RDP |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, | ) |
| Defendants. | ) |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.  The Constitution's Census Clause, the Fourteenth Amendment, Enabling
    Legislation, and the Census Bureau's Residence Criteria .................................. 2

II. Allegations of Plaintiffs' Complaint .................................................................. 3

LEGAL STANDARDS ....................................................................................................... 4

ARGUMENT ....................................................................................................................... 5

I.  Plaintiffs' Congressional Representation and Electoral College Injuries Are Too
    Speculative to Confer Standing .......................................................................... 6

II. Alabama's Alleged Financial Injury, Which Is Outside the Census Clause's Zone of
    Interests, is Too Speculative to Confer Standing .............................................. 10

CONCLUSION .................................................................................................................. 11

## INTRODUCTION

Plaintiffs the State of Alabama and Representative Mo Brooks challenge the Census Bureau's practice of counting all persons who are residing in a state at the time of the census, regardless of immigration status. In particular, Plaintiffs challenge the inclusion of illegal aliens in the decennial census for apportionment purposes for both the House of Representatives and the Electoral College. This Court, however, need not reach the merits of whether the Census Bureau should exclude illegal aliens from the census because Plaintiffs lack standing to bring this lawsuit. *See* Fed. R. Civ. P. 12(b)(1).

Plaintiffs allege that including illegal aliens in the census will result in Alabama losing a congressional seat and one Electoral College vote. Plaintiffs, however, have failed to demonstrate—even at the pleading stage—that the inclusion of illegal aliens would actually result in this injury. The very purpose of the census—an event that will not even take place until 2020—is to count the number of people residing in each state. Because that count will provide the basis for apportionment of representatives across all 50 states (and Electoral College votes across those same states and the District of Columbia), Plaintiffs would need to account for the impact of excluding illegal aliens in all of the states. That is all but impossible to do because the census has not yet taken place, thus making their claimed injury speculative, conjectural, and hypothetical. As a fallback, Alabama alleges that it is likely to lose funding if illegal aliens are included in the census, but that claimed injury is just as speculative as its claimed loss of representation because it relies upon the same type of prediction as to what the census will yield. And in any event, Alabama's alleged financial injury falls outside the zone of interests protected by the Constitution's Census Clause, thus precluding prudential standing to pursue relief for any such injuries.

1

For these reasons, there simply is no case or controversy that would justify having this Court wade into the constitutional and other claims raised by Plaintiffs' lawsuit. Accordingly, and as set forth in more detail below, this Court should dismiss Plaintiffs' Complaint for lack of jurisdiction.

## BACKGROUND

### I. The Constitution's Census Clause, the Fourteenth Amendment, Enabling Legislation, and the Census Bureau's Residence Criteria

The Constitution requires the federal government to conduct a decennial census to apportion Representatives in Congress among the states. Article I, Section 2, Clause 3 of the Constitution provides that "Representatives . . . shall be apportioned among the several States . . . according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, . . . excluding Indians not taxed, three fifths of all other Persons." After the abolition of slavery, that rule was modified by the first sentence of Section 2 of the Fourteenth Amendment, which reads: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." Each State's number of representatives, together with its two Senators, also determines the number of electors for President and Vice President in the Electoral College. *See* U.S. Const. art. II, § 1, cl. 2.

To determine the whole number of persons in each State, the Constitution provides that a census shall be taken every ten years "in such Manner as [Congress] shall by Law direct." U.S. Const. art. I, § 2, cl. 3. Congress, in turn, has implemented that requirement by directing the Secretary of Commerce every ten years to take a census of the "total population." 13 U.S.C. §§ 141(a) and (b). The Census Bureau assists the Secretary of Commerce in the performance of this responsibility. *See* 13 U.S.C. §§ 2, 4. After the census is taken, congressional seats are

2

distributed pursuant to "the method of equal proportions," a complex process that ranks states in order of priority based on their populations (multiplied by a multiplier).  *See* 2 U.S.C. § 2a(a); *see generally U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 461 (1992).

Pursuant to the criteria promulgated by the Census Bureau, most people are counted "at their usual residence, which is the place where they live and sleep most of the time."  Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525, 5533 (Feb. 8, 2018) ("Residence Rule" or "Residence Criteria").[1]  According to these criteria, "[c]itizens of foreign countries living in the United States," including foreign citizens living here illegally, are "[c]ounted at the U.S. residence where they live and sleep most of the time."  *Id.*[2]

## II.    Allegations of Plaintiffs' Complaint

Plaintiffs consist of the State of Alabama and Congressman Mo Brooks, who currently represents Alabama's 5th Congressional District.  *See* Compl. ¶¶ 1, 2, ECF No. 1.  Alabama asserts that it "has a cognizable interest in its own right in representation in the House of Representatives and the Electoral College."  Compl. ¶ 1.  Representative Brooks alleges that he is a "registered voter in the State of Alabama" and that "[t]he Congressional district he represents will be disrupted by a reapportionment that accounts for illegal aliens and his vote will be diluted."  Compl. ¶ 2.

Plaintiffs allege that the inclusion of illegal aliens will redistribute congressional seats and Electoral College votes from states that have comparatively fewer illegal alien residents to those that have a comparatively larger illegal alien resident population.  *See* Compl. ¶¶ 29-72.

---

[1] There are a few exceptions.  For example, people in certain types of group facilities are counted at those facilities.  And people who do not have a usual place of residence (such as homeless individuals) are counted "where they are on Census Day."  83 Fed. Reg. at 5533.

[2] Citizens of foreign countries who are members of the diplomatic community are counted at the embassy, consulate, United Nations facility, or other residence where the diplomats live.  Citizens of foreign countries who are merely visiting the United States, however, are not counted in the census.  *See id.*

The State of Alabama also alleges that it will lose federal and other funding on a comparative basis as a result of the inclusion of illegal alien residents in the census. *See* Compl. ¶¶ 73-86. All of these allegations of harm are based on the "estimated" impact of including illegal aliens in the census count. Compl. ¶ 51.

Plaintiffs' Complaint presents five causes of action. Count I alleges that the inclusion of illegal aliens in the census violates the Equal Protection Clause of the Fourteen Amendment to the extent illegal aliens will be included for purposes of congressional apportionment. Count II alleges that the inclusion of illegal aliens violates the Equal Protection Clause of the Fourteenth Amendment and Articles I and II of the Constitution to the extent illegal aliens will be included for purposes of allocating Electoral College votes. Count III alleges that the inclusion of illegal aliens in the census count violates the Constitution's requirement of an "actual enumeration" of the number of persons in each state. Count IV alleges that the Residence Rule is arbitrary and capricious under the APA because the Census Bureau allegedly failed to explain why it was including illegal aliens in the census count. Finally, Count V alleges that the Residence Rule is unlawful under the APA because Plaintiffs believe that illegal aliens should be excluded from the census count. Plaintiffs seek declaratory relief, including a vacatur of relevant portions of the Residence Rule, but do not identify how the Census Bureau should actually go about excluding illegal aliens from the census.

## LEGAL STANDARDS

A plaintiff must establish a court's jurisdiction through sufficient allegations to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991)

(internal quotation marks and citations omitted).  "[A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint."  *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007).  "Facial attacks on the complaint 'require the court merely to look and see if [the] plaintiff has successfully alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).

## ARGUMENT

The possession of constitutional standing under Article III requires that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "[A]t an irreducible minimum" the doctrine of standing requires that a plaintiff must establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and the defendant's challenged conduct, such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Defs. of Wildlife*, 504 U.S. at 560-61.  A court must dismiss a claim for lack of subject matter jurisdiction if the plaintiff fails to establish each of these elements of standing.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475-76 (1982) ("Those who do not possess Art[icle] III standing may not litigate as suitors in the courts of the United States.").  Rigorous application of standing requirements is appropriate where, as here, a party seeks to have a court invalidate on

constitutional grounds the acts of a co-equal Branch of government. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 145-46; *Valley Forge Christian Coll.*, 454 U.S. at 472-73.

As the party invoking federal jurisdiction, plaintiffs bear the burden of establishing the required elements of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Defs. of Wildlife*, 504 U.S. at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* However, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002); *see also FW/PBS. Inc. v. Dallas*, 493 U.S. 215, 231 (1990) ("[I]t is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' . . . 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" (citation omitted)).

Plaintiffs in this case have not met this burden. Plaintiffs allege that the State of Alabama will lose congressional and Electoral College representation as a result of the inclusion of illegal aliens in the census. That injury is entirely speculative, thus precluding standing on that basis by either Alabama or Representative Brooks, who alleges injury as a voter in his congressional district. Nor can the State of Alabama point to any actual or imminent injury relating to the loss of funds, which is every bit as speculative as the alleged injury deriving from a loss of representation. And even if Alabama could demonstrate an injury relating to the loss of funding, any such injury falls outside the zone of interests protected by the Enumeration Clause.

**I.   Plaintiffs' Congressional Representation and Electoral College Injuries Are Too Speculative to Confer Standing**

Plaintiffs' first asserted injury is that the government's failure to exclude resident illegal aliens from the census will result in a dilution of Plaintiffs' representation in the House of

6

Representatives and in the Electoral College.  *See* Compl. ¶ 50.  A plaintiff cannot establish standing to challenge a census practice, however, based on that practice's alleged effect on the apportionment of representatives, unless it can show that using its preferred census practice would have caused the state to gain an additional representative.  In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the plaintiffs claimed (*inter alia*) that the apportionment was inaccurate because the decennial census had allocated overseas federal employees to particular states based on inaccurate data.  But because the plaintiffs had not "shown . . . that Massachusetts would have an additional Representative if the allocation had been done using some other source of 'more accurate' data," they "d[id] not have standing to challenge the accuracy of the data."  *Id.* at 802 (plurality opinion).

The Complaint here concedes that Plaintiffs cannot show that the exclusion of illegal aliens from the census would result in Alabama's gaining an additional representative.  Plaintiffs merely assert that including illegal aliens "will *likely* result" in a loss of representation.  Compl. ¶ 50 (emphasis added).  That allegation alone reveals that Plaintiffs fall far short of demonstrating an "injury in fact" that is "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or 'hypothetical' or otherwise speculative."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alleged future injury must be '*certainly impending*"; "'[a]llegations of *possible* future injury' are not sufficient" (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))).[3]

---

[3] Indeed, Plaintiffs purport to support this contention only with bare assertions that do not support a plausible inference of injury.  For example, Plaintiffs allege that the illegal alien population is unevenly distributed in the United States, Compl. ¶¶ 33-36, but do not plausibly allege how any such uneven distribution affects Alabama in comparison to other states, *see id.* ¶¶ 42-45.  Instead, Plaintiffs offer only the bare assertion that counting illegal aliens will cause "the size of Alabama's congressional delegation [to] fall."  *Id.* ¶ 56.

7

Moreover, the process of apportionment itself makes any pre-census allegations as to the distribution of representatives (and, therefore, electors) speculative. That process determines each state's representation in the House of Representatives and Electoral College by ranking states in order of priority based on population. *See* 2 U.S.C. § 2a(a); *see generally U.S. Dep't of Commerce*, 503 U.S. at 461. Thus, each state's representation will depend not just on its own population, but on the population of other states as well. Plaintiffs allege that any future injury of lost representation "can be accurately measured by removing the estimated illegal alien population from each state's projected total population and recalculating the allocation of seats in the House of Representatives using the method of equal proportions." Compl. ¶ 51. Plaintiffs fail to explain how they identify the "estimated illegal alien population" (other than cite estimates that are now several years old, *see* Compl. ¶ 30, if not older, *see* Compl. ¶¶ 39-40), much less account for the fact that the apportionment is sensitive to even very small population shifts, *see Wisconsin v. City of New York*, 517 U.S. 1, 11-12 (1996) (citing reasons why the Secretary decided not to statistically adjust the 1990 census); *Ridge v. Verity*, 715 F. Supp. 1308, 1320 (W. D. Pa. 1989); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 n.10 (D.D.C. 1980), and hence would be sensitive to small inaccuracies in estimates as well. And because the apportionment process is based on the population of every state, Plaintiffs' method requires population projections for all residents, regardless of legal status, for *every* state in the year 2020, even though 1) the 2020 census has not yet taken place; and 2) state populations will continue to change between now and 2020. It is therefore impossible to "accurately measure" the population before the actual measurement. Instead, it would be "sheer speculation as to the identities of the states that will be affected by the inclusion of illegal aliens in the census count for purposes of apportionment." *Ridge*, 715 F. Supp. at 1318; *see also*

8

*Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (noting that plaintiff's claim of standing to challenge the method of apportionment "presents difficulty" because plaintiff "would have to show, at least approximately, the apportionment his interpretation . . . would yield, not only for New York but for every other State as well."); *Fed'n for Am. Immigration Reform*, 486 F. Supp. at 570, 572 (holding "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" when plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" depending on "the interplay of all the other population factors which affect apportionment").[4]

All of these arguments apply equally to claims asserted by Representative Brooks, and then some. To the extent the State of Alabama's injuries are speculative, so, too, are any alleged injuries suffered by Representative Brooks, who appears to be bringing his claims as a voter in his congressional district.[5] Any such injury, however, is just as speculative as Alabama's alleged injury. *See Ridge*, 715 F. Supp. at 1312-18 (concluding that congressional representatives suing in individual capacity could not establish injury-in-fact due to speculative nature of their claims); *see also Fed'n for Am. Immigration Reform*, 486 F. Supp. at 570.

---

[4] There is another basis to question Alabama's standing. The state is bringing this action as a *state qua state*, not as *parens patriae*. *See* Compl. ¶ 1 (alleging that the state "has a cognizable interest *in its own right* in representation in the House of Representatives and the Electoral College"). The *Ridge* court found, however, that allegations of "[t]he loss of representation," whether in the House of Representatives or the Electoral College, "cannot be suffered by a state, but only by the residents of [a] state." *Ridge*, 715 F. Supp. at 1321.

[5] If Representative Brooks is pursuing claims in his capacity as a Representative, any injuries would be speculative because it is unclear (and unalleged in the Complaint) what effect, if any, the inclusion of illegal aliens would have on his particular congressional district. That, alone, justifies dismissal of any claims being brought by Representative Brooks in that capacity. And to the extent Representative Brooks contends that he has standing as a legislator, that clearly fails because legislative standing has been recognized in only two instances: "(1) when the [legislators] have been individually deprived of something they are personally entitled to, as in *Powell v. McCormack,* 395 U.S. 486 (1969)," or "(2) when the [legislators'] votes would have been sufficient to defeat (or enact) a bill which has gone into effect (or not been given effect) and 'their votes have been completely nullified,' as in *Coleman v. Miller*, 307 U.S. 433 (1939)." *Common Cause v. Biden*, 909 F. Supp. 2d 9, 24 (D.D.C. 2012) (some citations omitted) (citing *Raines v. Byrd*, 521 U.S. 811, 821-23 (1997)), *aff'd,* 748 F.3d 1280 (D.C. Cir. 2014). Neither of these circumstances are present here.

## II. Alabama's Alleged Financial Injury, Which Is Outside the Census Clause's Zone of Interests, Is Too Speculative to Confer Standing

Alabama also alleges that the inclusion of illegal aliens in the census will reduce the amount of federal and private funding that Alabama receives. *See* Compl. ¶¶ 73-86. Alabama's claim, of course, relies upon the same type of conjecture as its claim regarding a loss of representation: It is simply too speculative to predict what will be revealed by a census that has not yet taken place, and that will not occur until more than a year in the future. And to the extent funding decisions are based on total population, Alabama would nonetheless receive its fair share based on its total population, including its population of illegal alien residents (many of whom use government services, such as attending schools). For those reasons alone, Alabama's claim that it will lose federal funds if illegal aliens are included in the census is too speculative to support standing.

Alabama has failed to demonstrate injury for another reason: Although it is true that the enumerated population of the states will be larger with the inclusion of illegal aliens than it would be without their inclusion, Plaintiffs have not calculated whether the inclusion of illegal aliens in every state's population would result in a proportional or absolute loss of federal funds going to Alabama or its legal residents. Instead, Plaintiffs assert that some of this funding is based on population size and "[t]hese funds will be redistributed to states that show a higher population total in the Census that they would have shown if illegal aliens were excluded from the Census." Compl. ¶ 81. As for private funds, Plaintiffs fail to allege anything specific at all. Instead, they vaguely allude to "Department of Commerce estimates" about "private sector investment" by unidentified "[n]on-profit organizations." Compl. ¶¶ 83-84. Plaintiffs can only speculate that nonprofits providing natural disaster relief would leave Alabama for more highly concentrated communities of illegal alien residents. Compl. ¶ 84. Therefore, given the

10

complexity of federal funding mechanisms and Plaintiffs' failure to allege any specific funding losses, Plaintiffs' allegations of lost funding are too speculative to establish Article III standing. *See Nat'l Law Ctr. on Homelessness & Poverty, v. Kantor*, 91 F.3d 178, 185 (D.C. Cir. 1996) (finding no standing where court could not determine "what effect any methodology for counting the homeless would have on the federal funding of any particular appellant.").[6]

Finally, even if Alabama has adequately pled a non-speculative funding injury, any such injury would not bring it within the zone of interests protected by the Constitution's Census Clause, which has no relation, and was not intended, to provide funding to state or local projects. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) ("[A] plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his [C]omplaint.") (citation omitted). Alabama's claimed funding-related injuries should therefore be dismissed for lack of prudential standing.

## CONCLUSION

This Court should dismiss Plaintiffs' Complaint for lack of jurisdiction.

---

[6] The Complaint does not appear to make any similar "loss of funding" claims by Representative Brooks, as it fails to allege that the Representative's district, in particular, will lose funding.

11

Dated: November 13, 2018

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Branch Director

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG (DC Bar #467513)
Assistant Branch Director
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel.:  (202) 514-3374
Fax:  (202) 616-8460
Email:  brad.rosenberg@usdoj.gov

*Counsel for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2018, I caused to be electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

*For Plaintiff:*

| | |
|---|---|
| Brad A. Chynoweth | bchynoweth@ago.state.al.us |
| Eric Michael Palmer | mnewman@ago.state.al.us |
| James W. Davis | jimdavis@ago.state.al.us |
| Steven Troy Marshall | smarshall@ago.state.al.us |
| Winfield J. Sinclair | wsinclair@ago.state.al.us |

*For Proposed Intervenor-Defendants:*

| | |
|---|---|
| Denise Marie Hulett | dhulett@maldef.org |
| James U. Blacksher | jblacksher@ns.sympatico.ca |
| Andrea E. Senteno | asenteno@maldef.org |
| W. Edward Still | Still@votelaw.com |
| Ming Ming Yang | mmyang@debevoise.com |
| Robin Thurston | rthurston@democracyforward.org |
| Anil A. Mujumdar | anil@zarzaur.com |
| Jyotin Hamid | jhamid@debevoise.com |
| Lauren M. Dolecki | lmdolecki@debevoise.com |
| Ryan M. Kusmin | rmkusmin@debevoise.com |
| Robert D. Segall | segall@copelandfranco.com |
| Danielle Luce Goldstein | danielle.goldstein@cco.sccgov.org |
| Jonathan Weisglass | jonathan@weissglass.com |
| Marcelo Quinones | marcelo.quinones@cco.sccgov.org |

I also hereby certify that I have caused to be mailed by United States Postal Service the document to the following non-CM/ECF participant:

Morris J. Brooks, Jr.
2101 W. Clinton Ave.
Suite 302
Huntsville, AL  35805

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG (DC Bar #467513)
Assistant Branch Director
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel.:  (202) 514-3374
Fax:  (202) 616-8460
Email:  brad.rosenberg@usdoj.gov

*Counsel for Defendant*