# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| STATE OF ALABAMA, and MORRIS J. BROOKS, JR., <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, WILBUR L. ROSS, in his official capacity as Secretary of Commerce, BUREAU OF THE CENSUS, and RON S. JARMIN, in his capacity as performing the non-exclusive functions and duties of the Director of the U.S. Census Bureau, <br><br> *Defendants*, <br><br> And <br><br> DIANA MARTINEZ, RAISA SEQUEIRA, SAULO CORONA, IRVING MERDINA, JOEY CARDENAS, FLORIDA P. CHAVEZ, and CHICANOS POR LA CAUSA; <br><br> COUNTY OF SANTA CLARA, CALIFORNIA; KING COUNTY, WASHINGTON; and CITY OF SAN JOSE, CALIFORNIA, <br><br> *Defendants-Intervenors*. | 2:18-cv-00772-RDP |

**INITIAL BRIEF OF AMICUS CURIAE IMMIGRATION REFORM
LAW INSTITUTE IN SUPPORT OF PLAINTIFFS AND IN
<u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTEREST OF *AMICUS CURIAE* ........................................................................................ 1

INTRODUCTION ..................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

    I.      Both Plaintiffs Have Sufficiently Alleged Representational And Financial Injuries
          From The Residence Rule ........................................................................................ 2

    II.     Congressman Brooks Has Standing Because His Vote Will Be Diluted .......................... 6

    III.    Plaintiffs' Claims Are Redressable ................................................................................. 9

CONCLUSION ........................................................................................................................ 12

# **TABLE OF AUTHORITIES**

**CASES**

*Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) ...................................................... 9

*Brown v. Saunders*, 166 S.E. 105 (1932) ........................................................................................ 7

*Carey v. Klutznick*, 637 F.2d 834 (2d Cir. 1980) ........................................................................... 6

*City of Camden v. Plotkin,* 466 F. Supp. 44 (D.N.J. 1978) ............................................................ 6

*City of New York v. Dept. of Commerce,* 713 F. Supp. 48 (E.D.N.Y. 1989) ................................. 6

*City of Willacoochee v. Baldrige,* 556 F. Supp. 551 (S.D. Ga. 1983) ............................................ 6

*Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008) ................................................................... 3

*Department of Commerce v. United States House of Representatives*, 525 U.S. 316 (1999) ........ 7

*Duncan v. Coffee Cty.*, 69 F.3d 88 (6th Cir. 1995) ......................................................................... 7

*Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) .................................................................................... 9

*FEC v. Akins*, 524 U.S. 11 (1998) .................................................................................................. 7

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ......................................................................... 10

*Gavin v. Clinton*, 19 F.Supp. 2d 543 (E.D. Va. 1998) ................................................................... 6

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ........................................................................................ 8

*Howell v. McAuliffe*, 788 S.E.2d 706 (2016) ................................................................................. 7

*Made in the USA Found. v. United States,* 242 F.3d 1300 (11th Cir. 2001) ................................ 10

*Michel v. Anderson,* 14 F.3d 623 (D.C. Cir. 1994) ........................................................................ 7

*Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279 (11th Cir. 2010) ......................................... 10

*Nat'Law Center on Homelessness and Poverty v. Kantor*, 91 F.3d 178 (D.C. Cir. 1996) ............. 5

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .......................................................................................... 6

*Scarfo v. Ginsberg*, 175 F.3d 957 (11th Cir. 1999) ........................................................................ 3

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ............................................................................. 2

*Susan B. Anthony List v. Dreihaus*, 573 U.S. 149 (2014) .................................................................. 3

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ........................................................................................ 2

*Tucker v. Department of Commerce,* 958 F.2d 1411 (7th Cir.) ......................................................... 6

*Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015) ............................. 3

*Wesberry v. Sanders*, 376 U.S. 1 (1964) .......................................................................................... 8

**OTHER AUTHORITIES**

Bryan Baker, *Estimates of the Illegal Alien Population Residing in the United States: January 2015*, DHS Office of Immigration Statistics (December 2018) ................................................. 15

Pew Research Center, *U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade* (November 27, 2018) ...................................................................................................... 16

**RULES**

Federal Rule of Civil Procedure 8(a)(2) .......................................................................................... 3

Federal Rule of Civil Procedure 12(b)(1) ......................................................................................... 1

**REGULATIONS**

Immigration and Nationality Act, Chapter 7 (Registration of Aliens), 8 U.S.C. § 1301 et seq. .. 15

**INTEREST OF *AMICUS CURIAE***

*Amicus Curiae* the Immigration Reform Law Institute ("IRLI") files this brief with the written consent of the parties. IRLI is a nonprofit public-interest law firm incorporated in the District of Columbia. IRLI is dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens and legal permanent residents, and to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed *amicus curiae* briefs in many important immigration cases.

IRLI is a supporting organization of the Federation for American Immigration Reform ("FAIR"). For more than twenty years, the Board of Immigration Appeals has solicited amicus curiae briefs drafted by IRLI staff for FAIR because the Board considers IRLI an expert in immigration law.

FAIR has a longstanding interest in census issues as they pertain to citizenship and immigration, as evidenced by its extensive involvement in the census and apportionment cases *FAIR v. Klutznick*, 486 F. Supp. 564 (D.D.C. 1980), and *Ridge v. Verity*, 715 F. Supp. 1308 (W.D. Pa. 1989).

**INTRODUCTION**

Defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), claiming that "Plaintiffs lack standing to bring this lawsuit," Doc. 45-1, ¶1. Defendants assert that "Plaintiffs have failed to demonstrate—even at the pleading stage—that the inclusion of illegal aliens would actually result in [the] injury" of "Alabama losing a congressional seat and one Electoral College vote." Doc. 45-1, ¶1. Defendants argue that Plaintiffs' "claimed injury is speculative, conjectural, and hypothetical," because Plaintiffs must "account for the impact of excluding illegals in all states," a task Defendants assert is "all but impossible … because the census has not yet taken place." *Id.* In addition, the Martinez Intervenors argue that Plaintiffs'

injury is not redressable, because either Congress or the president could act to nullify any relief this Court might order. Doc. 60.

On the contrary, both Plaintiffs, Alabama and Representative Morris J. Brooks, Jr. ("Congressman Brooks"), have pled more than sufficient facts to support standing. Alabama will suffer financial harms and the loss of representation in the national government if illegal aliens are counted in the census for apportionment. Congressman Brooks will suffer both financial harm and the dilution of his vote if illegal aliens are counted. These injuries are fully redressable by the requested relief: an order to Defendants not to include illegal aliens in the apportionment count reported to the president. As explained below, a statistical resource is available to Defendants to accomplish this result with sufficient accuracy, and this Court should assume that the president and Congress will not override the apportionment count arrived at by Defendants.

## ARGUMENT

Federal courts implement the constitutional restriction of their jurisdiction to "cases or controversies by ensuring that at least one plaintiff in any federal case has 'standing.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018). Standing is measured by a "familiar three-part test," which requires a plaintiff to show "(1) … an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Under this test, both Plaintiffs have pled more than sufficient facts to overcome Defendants' facial challenge to their standing.

**I.    Both Plaintiffs Have Sufficiently Alleged Representational And Financial Injuries From The Residence Rule.**

In their Motion to Dismiss, Defendants have not asked the Court to consider any evidence outside of the pleadings. Therefore, Defendants' Rule 12(b)(1) motion is a "facial attack" on the Complaint. *Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir. 1999). Such standing challenges "require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject

2

matter jurisdiction, and the allegations in [plaintiff's] complaint are taken as true for the purposes of the motion." *Id.* (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)) (internal quotation marks omitted).

To establish injury-in-fact for standing purposes, an injury "need not be actualized" to satisfy Article III. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). A "future injury" can suffice, provided that it is "certainly impending, *or* there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 157 (2014) (emphasis added).

Under the Federal Rules of Civil Procedure, there is no requirement that a plaintiff detail every fact upon which a claim is to be based. It is only required that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The purpose of [Rule 8(a)(2) and Rule 10(b)] is self-evident, to require the pleader to present his claims discretely and succinctly, so that … the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015).

Plaintiff State of Alabama has easily met this standard in its Complaint, alleging facts that show a "substantial risk" that Plaintiff State of Alabama's claimed injury will occur, absent the requested relief.

To begin with, Plaintiffs note that the Residence Rule, as published by the Census Bureau, provides that "foreign nationals living in the United States will be counted in the census and allocated to the state where their 'usual residence' is located—regardless of whether they are legally present in the United States." Doc. 1, ¶ 1 (citing 83 Fed. Reg. 5525 (February 8, 2019)). Plaintiffs plead that "as a result [of implementation of the Residence Rule], the congressional and electoral apportionment predicated on the 2020 census numbers will re-allocate a congressional

seat and an electoral vote from the State of Alabama to a state with a larger illegal alien population." Doc. 1, ¶ 1.

In support of Plaintiffs' claim, the Complaint details how the challenged Residence Rule mandates that the Secretary of Commerce prepare a tabulation of total population by states, pursuant to 13 U.S.C. § 141(b); that the tabulation include the illegal alien population of each state; and that the tabulation will ultimately determine the apportionment of both the House of Representatives and the Electoral College. Doc. 1, ¶¶ 16-28. Plaintiffs plead that the Census Bureau is required, under 2 U.S.C. § 2a(a), to use the "method of equal proportions" to calculate the allocation of seats, and that every apportionment since 1940 has applied this method. Doc. 1, ¶¶ 52-54. Plaintiffs also allege that official estimates of the number of illegal aliens in the United States reached historic levels by the end of the 1990s, and that the Census Bureau, in the past, has failed to exclude illegal aliens from its enumerations used for apportionment. Doc. 1, ¶¶ 29-36. Plaintiffs then allege that the illegal alien population is distributed very unequally among the fifty states, with, proportionally, low numbers of illegal aliens in Alabama and high numbers in certain other states. Doc. 1, ¶¶ 46, 56-59, 62-63. The Complaint then sets forth how Defendants' agency's practice of including illegal aliens in the 2000 and 2010 censuses for apportionment purposes caused the redistribution of House seats and electoral votes to states with high numbers of illegal aliens from states with low numbers in the subsequent reapportionments. Doc. 1, ¶¶ 37-47. Together, these facts, though they fall short of unquestionable statistical proof, show a "substantial risk" that Alabama will lose representation in the national government if illegal aliens are counted in the census for apportionment purposes.

In any case, whether Plaintiff State of Alabama will experience its projected injury-in-fact—the loss of representation—is a determination on the merits. Apportionment is a complex process, involving the ranking of states based on their population to determine priority for

4

congressional seats pursuant to 2 U.S.C. § 2a(a). At this early stage in the litigation, Plaintiffs' yet-to-be proven factual claims about loss of representation cannot be dismissed based on no more than Defendants' equally unproven assertions that any consequences from the practice of including illegal aliens must be too speculative to support a finding of standing. Doc. 45-1 at 8-11.

In addition to their representational injuries, Plaintiffs further allege a substantial risk of future financial injury-in-fact, in the form of a loss of federal funding.  Doc. 1, ¶¶ 2, 72-81. For their part, the Local Government Intervenors agree that Plaintiffs have demonstrated financial standing. Doc. 59, ¶ 2 (citing *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009) (presuming that general allegations embrace those specific facts that are necessary to support the claim). The City of San Jose, one of the Local Government Intervenors, was granted standing based on the similar ground of financial injury in a challenge to the 2020 Census pending in the Ninth Circuit. *Id.*, n. 2 (citing *California v. Ross*, No. 18-cv-01865-RS, Doc. 75, Order Denying Motions to Dismiss, 12-13 (N.D. Cal. Aug. 17, 2018)).

As multiple courts have recognized, under a motion to dismiss, it is premature to determine whether a state will in fact lose federal funding. *See Nat'l Law Center on Homelessness and Poverty v. Kantor*, 91 F.3d 178, 185 (D.C. Cir. 1996) (citing *City of Detroit v. Franklin,* 4 F.3d 1367, 1374 (6th Cir. 1993)), *cert. denied,* 510 U.S. 1176, (1994); *Tucker v. Department of Commerce,* 958 F.2d 1411, 1415-16 (7th Cir. 1992), *cert. denied,* 506 U.S. 953 (1992); *City of New York v. Dept. of Commerce,* 713 F. Supp. 48, 50-52 (E.D.N.Y. 1989); *City of Willacoochee v. Baldrige,* 556 F. Supp. 551, 554 (S.D. Ga. 1983); *City of Camden v. Plotkin,* 466 F. Supp. 44, 47-51 (D.N.J. 1978)). In any event, Plaintiffs have adequately demonstrated a loss of federal funding by alleging that Alabama, proportionally, has many fewer illegal aliens than other states, and that it will receive federal funding based on its proportion of the total U.S. population as arrived at in the census. Doc. 1, ¶¶ 73-81. This basis for standing—of both political jurisdictions

and individuals—is well-established. *See, e.g., Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (holding that citizens who challenge a census count "on the basis, *inter alia*, that improper enumeration will result in loss of funds to their city have established… injury in fact traceable to the Census Bureau")); *see also Gavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998) (standing found where plaintiffs demonstrated that proposed census procedures would result in a future decrease of funding for the states in which they reside); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980) (standing found where plaintiffs did not personally receive federal aid allocated to Philadelphia but were still beneficiaries since "the City is enabled to improve quality of life through the receipt of [federal funding]".).

## II.     Congressman Brooks Has Standing Because His Vote Will Be Diluted.

Congressman Brooks also has standing based on his claim that his individual vote as a citizen-inhabitant of Alabama will be diluted. Doc. 1, ¶ 3.

Federal standing law has long recognized that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4, (2006) (per curiam) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)); *Duncan v. Coffee Cty.*, 69 F.3d 88, 94 n.3 (6th Cir. 1995) (observing that, "[n]aturally, any time voters are added to the rolls . . . those already on the rolls have had their votes diluted"); *see also Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 331-332 (1999) (finding standing because "[w]ith one fewer Representative, Indiana residents' votes will be diluted"); *Michel v. Anderson,* 14 F.3d 623, 626 (D.C. Cir. 1994) (finding "voters have standing to challenge practices that are claimed to dilute their vote, such as being placed in a voting district that is significantly more populous than others"); *accord FEC v. Akins*, 524 U.S. 11, 24 (1998) (holding that interference with the voting rights of large numbers of voters, though widely shared, is a concrete injury for Article III purposes); *Brown*

6

*v. Saunders*, 159 Va. 28, 31-32, 46, 166 S.E. 105, 111 (1932) (upholding a challenge to a redistricting scheme by a candidate for the United States House of Representatives because the "inequality" in numbers between the districts was "obvious, indisputable, and excessive"); *cf. Howell v. McAuliffe*, 292 Va. 320, 332, 788 S.E.2d 706, 713 (2016) (holding that a Virginia registered voter planning to vote in the 2016 General Election had standing because the voter was directly affected by the allegedly unconstitutional expansion of the statewide electorate to include certain felons).

In great detail, Plaintiffs set forth the degree to which Congressman Brooks's vote will be diluted if he does not receive the requested relief. Plaintiffs provide (by reference) and then apply the method of equal proportions used by the Census Bureau:

> [The method of equal proportions] assigns seats in the House of Representatives according to a "priority" value." The priority value is determined by multiplying the population of a state by a "multiplier," [ $1/ \sqrt{(n(n-1))}$ ]. For example, following Census 2000, each of the 50 states was given one seat out of the current total of 435. The next, or 51st seat, went to the state with the highest priority value and thus became that state's second seat. This continued until all 435 seats had been assigned to a state.

Doc. 1, ¶ 53, n.19 (citing United States Census Bureau, *Computing Apportionment*, available at www.census.gov/topics/public-sector/congressional-apportionment/about/computing.html).

Applying the Census Bureau methodology to current estimates of total and illegal alien populations of the fifty states, Plaintiffs demonstrate that including illegal aliens in the application of this statutory procedure to the 2020 census will likely make the apportioned population of an average Alabama congressional district contain 97,726 more constituents than an average district in states that gain or do not lose a seat. *Id.*, ¶¶ 55-69. In contrast, Plaintiffs plead, if illegal aliens are *not* counted, the apportioned population of an average Alabama congressional district will have 56,060 fewer constituents than the average district in those other states. *Id.*, ¶¶ 70-71. Clearly, Congressman Brooks's vote will have more weight in the latter circumstance than in the

former. Also, Plaintiffs point out that the reduction of the above differences by 41,666 (97,726 minus 56,060), produced by excluding the current estimated population of illegal aliens from the current estimated total population, represents "a reduction of representational inequality by 42.6 percent." Doc. 1, ¶ 72. It is more than plausible that a reduction of such magnitude, where achievable, is required by "the command of Art. I § 2 that Representatives be chosen 'by the People,'" because this command means that "as nearly as practicable one man's vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).

Congressman Brooks's voter dilution claim is distinguishable from the partisan gerrymandering voter dilution claims recently dismissed on standing grounds in *Gill v. Whitford*, 138 S. Ct. 1916 (2018). Congressman Brooks's claim is that his individual vote in federal elections for the Presidency and the House of Representatives will be diluted by the unconstitutional inclusion for interstate apportionment purposes of illegal aliens in the tabulation of the census. The Complaint does not challenge the methodology of the enumeration, but instead claims that the inclusion of illegal aliens in the apportionment base is unconstitutional, as would be the inclusion of foreign visitors. Doc. 1, ¶¶ 142, 145, 148. By contrast, the petitioners in *Gill* claimed standing to challenge the adverse partisan effect on a statewide basis of the Wisconsin legislature's decennial redrawing of its single-member districts. The Supreme Court held that to be "a collective political interest, not an individual legal interest." 138 S. Ct. at 1921. While Alabama appropriately claims statewide harm, Congressman Brooks only claims the dilution of his individual vote. Congressman Brooks's injury is thus more like the individual racial vote dilution injury recognized by the Supreme Court in *Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015), than the adverse-partisan-effect injury rejected in *Gill*.

In *Evenwel v. Abbott*, 136 S. Ct. 1120, 1123 (2016), the Supreme Court did hold that a state could "draw its legislative districts based on total population" rather than voter-eligible population. But *Evenwel* did not address, much less turn upon, the doctrine of standing. Had the plaintiffs in *Evenwel* lacked standing, the Supreme Court would have never reached the merits of their constitutional claim. The only mention of "standing" in the opinion was a footnote explaining why it was *not* an issue. 136 S. Ct. at 1131 n.12 (observing that voters could establish standing by asserting that their "votes were diluted" but that the "Court has not considered standing of nonvoters," a question that was "unlikely ever to arise given the ease of finding voters to serve as plaintiffs.").

### III. Plaintiffs' Claims Are Redressable.

The allegation of unlawful and unconstitutional inclusion of illegal aliens in the apportionment tabulations prepared by the Secretary of Commerce from 2020 census enumeration data can be readily remedied. The Complaint alleges that "effects of illegal immigration on congressional and electoral apportionment can be accurately measured by removing the estimated illegal alien population from each state's projected total population and recalculating the allocation of seats… using the method of equal proportions…" Doc. 1, ¶ 51.

"Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010). The Eleventh Circuit has adopted the redressability analysis in the plurality opinion of *Franklin v. Massachusetts*, 505 U.S. 788 (1992). In *Made in the USA Found. v. United States,* 242 F.3d 1300, 1309 (11th Cir. 2001), the United States had argued that "absent judicial authority to compel the President to withdraw from NAFTA, it is unlikely that the appellants' injuries would be redressed by a favorable ruling from this court." *Id.* at 1309. Rejecting this claim of lack of redressability,

9

the Eleventh Circuit pointed to the Supreme Court plurality's conclusion that the injury of a loss of a congressional seat due to wrongful reapportionment "is likely to be redressed by declaratory relief against the Secretary [of Commerce] alone." *Id.* (citing *Franklin*, 505 U.S. at 803). The Eleventh Circuit also followed the redressability holding in the Supreme Court's plurality opinion that declaratory relief was sufficient for standing purposes, because "it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court." *Id.*

The relief requested by Plaintiffs State of Alabama and Brooks includes vacatur and remand of the Final Residence Rule to the agency for revision, pursuant to the requested declaratory relief. It is uncontroverted that, should the Residence Rule be revised upon remand to change its definition of "usual residence" to exclude illegal aliens from the appropriations tabulation provided by the Secretary of Commerce to the president, the likelihood that Alabama would retain its current levels of congressional and Electoral College representation would significantly increase.

Plaintiffs pled that deduction of the federal government's best estimate of the population of illegal aliens by state from the 2020 enumeration will provide the necessary data to conduct a correct apportionment using the "rule of equal proportions." Doc. 1, ¶¶ 51-53. The U.S. Department of Homeland Security ("DHS") is charged by Congress with collecting and correcting data on the current street address (and thus census tract) of every alien present for more than thirty days in the United States. *See* Immigration and Nationality Act, Chapter 7 (Registration of Aliens), 8 U.S.C. § 1301, *et seq.* Also, DHS regularly estimates the illegal alien population. *See* Bryan Baker, *Estimates of the Illegal Alien Population Residing in the United States: January 2015*, DHS Office of Immigration Statistics (December 2018) ("Estimate"), available at

https://www.dhs.gov/immigration-statistics. In its 2018 report, DHS provided the following description of how it made its estimate:

> Two populations are estimated in order to derive the illegal alien population estimates: (1) the total foreign-born population living in the United States on January 1, 2015, and (2) the legally resident foreign-born population on the same date. The illegal alien population estimate is the residual when (2) is subtracted from (1). Foreign-born residents who entered the United States prior to 1980 are assumed to be legally resident since most would have become eligible to adjust to LPR status. Therefore, the starting point for the estimates was January 1, 1980. The steps involved in estimating the components of each population are shown in APPENDIX 1. Data on the total foreign-born population that entered during 1980–2014 by country of birth, state of residence, year of entry, age, and sex were obtained from the 2014 ACS ["American Community Survey"]. The ACS is a nationwide sample survey that collects information from U.S. households on social, demographic, and economic characteristics, including country of birth and year of entry of the foreign-born population. The ACS consists of non-overlapping samples from which information is collected monthly over the course of a year. The ACS was selected for the estimates because of its large sample size: about three million households per year compared to about 100,000 annually for the Current Population Survey, the primary alternative source of national data on the foreign-born population.
>
> Data on persons who obtained LPR status by country of birth, state of residence, age, sex, category of admission, and year of entry were obtained from DHS administrative records maintained in an application case tracking system of U.S. Citizenship and Immigration Services (USCIS). Data on refugees arriving in the United States by country of origin were obtained from the Department of State. Data on persons granted asylum by country of origin were obtained from USCIS for those granted asylum affirmatively and from the Executive Office for Immigration Review of the Department of Justice for those in removal proceedings granted asylum defensively. Data on nonimmigrant admissions by country of citizenship, state of residence, age, sex, and class of admission were obtained from I-94 arrival-departure records in the TECS database maintained by U.S. Customs and Border Protection. Estimates of the illegal alien population were generated for the ten leading countries of birth and states of residence and were disaggregated by age and sex. The Cuban-born population living in the United States was excluded from the estimates since, under U.S. immigration law and policy, most Cubans who were admitted or paroled into the United States were eligible one year later to apply to adjust to LPR status.

Estimate at 2-3.

The DHS methodology is generally accepted and applied by academic and expert demographers. For example, the Pew Research Center estimated the U.S. unauthorized

immigrant population by comparing a demographic estimate of the number of immigrants residing legally in the country with the total number of immigrants as measured by either the American Community Survey or the March Supplement to the Current Population Survey. Pew Research Center, *U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade*, at 36 (November 27, 2018), http://www.pewhispanic.org/2018/11/27/u-s-unauthorized-immigrant-total-dips-to-lowest-level-in-a-decade/.

It is thus substantially likely that, if directed by this court, Defendants can revise the Residence Rule on remand to exclude illegal aliens from the enumeration base, by using DHS data and adapting the agency's methodology to apply the rule of equal proportions to the appropriation base. Defendants can transmit the adjusted base to the president, and, pursuant to *Made in the USA Found.*, 242 F.3d at 1309, the Court may assume that the president is unlikely to tamper with the adjusted appropriations base, which he in turn will provide to Congress. The requested court-ordered relief will thus adequately redress Plaintiffs' injuries.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Respectfully submitted this 22nd of February, 2019,

*s/Stephen W. Williams*
**Stephen W. Williams**
AL Bar No. ASB-5501-T75W
*Local Counsel*
Foxtrot Family Law
460 Gunter Avenue
Guntersville, AL 35976
Telephone: (256) 213-1694
Email: Stephen@thinkfoxtrot.com

*s/Christopher J. Hajec*
**Christopher J. Hajec**
**Michael M. Hethmon**
*Pro Hac Vice Counsel for Amicus Curiae*

12

                    Immigration Reform Law Institute
                    25 Massachusetts Avenue NW, Suite 335
                    Washington, DC 20001
                    Telephone: (202) 232-5590
                    Fax: (202) 464-3590
                    Email: chajec@irli.org
                            mhethmon@irli.org

Case 2:18-cv-00772-RDP   Document 77   Filed 02/22/19   Page 17 of 20

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send email notification of such filing to the following:

Brad A. Chynoweth
Winfield J. Sinclair
James W. Davis
Steven Troy Marshall
Eric Michael Palmer
*Counsel for Plaintiff State of Alabama*
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 242-7300
Email: bchynoweth@ago.state.al.us
      wsinclair@ago.state.al.us
      jimdavis@ago.state.al.us
      smarshall@ago.state.al.us
      mnewman@ago.state.al.us

Brad Rosenberg
*Counsel for Defendants*
United States Department of Justice
Civil Division, Federal Programs Branch
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: brad.rosenberg@usdoj.gov

Thomas A Saenz
Julia A. Gomez
Andrea E. Senteno
*Counsel for Intervenor-Defendants Joey Cardenas, Florinda P. Chavez, Chicanos Por La Causa, Saulo Corona, Diana Martinez, Irving Medina, and Raisa Sequeira*
MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
634 S. Spring Street
Los Angeles, CA 90014
Telephone: (213) 629-2512
Email: tsaenz@maldef.org
      jgomez@maldef.org
      asenteno@maldef.org

Anil A. Mujumdar
*Counsel for Defendant-Intervenors King County, Washington, City of San Jose, California, and County of Santa Clara, California*
ZARZAUR MUJUMDAR & DEBROSSE
2332 2nd Ave. North
Birmingham, AL 35203
Telephone: (205) 983-7985
Email: anil@sarzaur.com

W. Edward Still
*Counsel for Intervenor-Defendants Joey Cardenas, Florinda P. Chavez, Chicanos Por La Causa, Saulo Corona, Diana Martinez, Irving Medina, and Raisa Sequeira*
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy., #161-304
Birmingham, AL 35209

Robin Thurston
*Counsel for Intervenor-Defendant City of San Jose, California*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 701-1775
Email: rthurston@democracyforward.org

Telephone: (205) 320-2882
Email: still@votelaw.com

James Uriah Blacksher
*Counsel for Intervenor-Defendants Joey Cardenas, Florinda P. Chavez, Chicanos Por La Causa, Saulo Corona, Diana Martinez, Irving Medina, and Raisa Sequeira*
JAMES U. BLACKSHER, ATTORNEY
300 21st Street N.
Birmingham, AL 35203
Telephone: (205) 591-7238
Email: jblacksher@ns.sympatico.ca

Ming Ming Yang
Jyotin Hamid
Ryan M. Kusmin
Lauren M. Dolecki
*Counsel for Intervenor-Defendant City of San Jose, California*
DEBEVOISE & PLIMPTON LLP
919 Third Ave.
New York, NY 10022
Telephone: (212) 909-6422
Fax: (212) 909-6836
Email: mmyang@debevoise.com
    jhamid@debevoise.com
    rmkusmin@debevoise.com
    lmdolecki@debevoise.com

Marcelo Quinones
Danielle Luce Goldstein
*Counsel for Intervenor-Defendant County of Santa Clara, California*
COUNTY OF SANTA CLARA
OFFICE OF THE COUNTY COUNSEL
70 West Hedding St., 9th Floor
San Jose, CA 95110
Telephone: (408) 299-5997
Fax: (408) 292-7240
Email: Marcelo.quinones@cco.sccgov.org
    Danielle.goldstein@cco.sccgov.org

Robert D. Segall
*Counsel for Intervenor-Defendant County of Santa Clara, California*
COPELAND FRANCO SCREWS & GILL, P.A.
444 South Perry Street
Montgomery, AL 36101-0347
Telephone: (334) 834-1180
Email: segall@copelandfranco.com

Jonathan Weissglass
*Counsel for Intervenor-Defendant County of Santa Clara, California*
LAW OFFICE OF JONATHAN WEISSGLASS
410 12th Street, Suite 250-B
Oakland, CA 94607
Telephone: (510) 836-4200
Email: jonathan@weissglass.com

and that I sent the foregoing by U.S. mail to the following non-CM/ECF participant:

Morris J. Brooks, Jr.

15

2101 W. Clinton Avenue, Suite 302
Huntsville, AL 35805
Telephone: (256) 355-9400
Fax: (256) 355-9406
*Pro se Plaintiff*

        *s/Stephen W. Williams*
        **Stephen W. Williams**
        AL Bar No. ASB-5501-T75W
        *Local Counsel*
        Foxtrot Family Law
        460 Gunter Avenue
        Guntersville, AL 35976
        Telephone: (256) 213-1694
        Email: stephen@thinkfoxtrot.com