FILED

2019 Jun-05  PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **STATE OF ALABAMA, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:18-cv-00772-RDP** |
| | } | |
| **UNITED STATES DEPARTMENT OF** | } | |
| **COMMERCE, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

In this case, the State of Alabama and U.S. Representative Morris J. Brooks, Jr. seek a declaratory judgment that the federal government's inclusion of illegal aliens in the population figures used to apportion congressional seats among the states is unlawful. (Doc. # 1). The federal defendants have moved to dismiss the lawsuit, asserting that Plaintiffs lack Article III standing. (Doc. # 45). After careful review, and with the benefit of oral argument, the court holds that Plaintiffs have adequately alleged Article III standing. Defendants' motion to dismiss is therefore due to be denied.

## I.  Background[1]

The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State." U.S. Const. amend. XIV, § 2. To make that apportionment possible, the Constitution

---

[1] For purposes of ruling on Defendants' motion to dismiss, the court treats the factual allegations of the complaint (Doc. # 1) as true, but not its legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019); *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335-36 (11th Cir. 2013).

mandates that an "actual Enumeration" be conducted "every . . . ten Years, in such Manner as [Congress] shall by Law direct." *Id.* art. I, § 2, cl. 3.

Heeding this mandate, Congress has by law directed the Secretary of Commerce to "in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year." 13 U.S.C. § 141(a). The decennial census may be taken "in such form and content as [the Secretary] may determine." *Id.* Following completion of the decennial census, the Secretary must submit to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States." *Id.* § 141(b).

These total population figures are then used for a variety of purposes. As relevant here, the population figures generated by the census are used to (1) apportion seats in the House of Representatives among the states, 2 U.S.C. § 2a(a), (b); (2) allocate Electoral College votes among the states, 3 U.S.C. § 3; and (3) allocate federal and private funds among the states (Doc. # 1 at 18-20, ¶¶ 73-86). The court briefly discusses the process by which each of these tasks is accomplished.

*Congressional Apportionment*: As noted above, the Constitution requires seats in the House of Representatives to be "apportioned among the several States according to their respective numbers, counting the whole number of persons in each State." U.S. Const. amend. XIV, § 2. Within nine months after April 1 of the decennial census year, the Secretary of Commerce must submit to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b). After receiving the Secretary's report, another statute instructs the President to "transmit to the Congress a statement showing the whole number of persons in each State . . . as

ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member." 2 U.S.C. § 2a(a).

Under that same statute, each state is "entitled . . . to the number of Representatives shown" in the President's statement, and the Clerk of the House of Representatives must "send to the executive of each State a certificate of the number of Representatives to which such State is entitled." *Id.* § 2a(b). Thus, the number of congressional representatives a given state receives is determined by the President's statement, which must apportion representatives based on the total population of each state "as ascertained under the . . . decennial census." *Id.* § 2a(a); *see also Franklin v. Massachusetts*, 505 U.S. 788, 791-92, 797-800 (1992) (describing the President's role in the reapportionment process).

<u>*Electoral College Vote Allocation*</u>: The number of presidential electors each state receives is directly tied to the state's congressional delegation and thus, by extension, to the state's population as determined in the decennial census. The Constitution provides that the number of electors in each state shall be "equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art. II, § 1, cl. 2. In keeping with this constitutional provision, Congress has provided that "[t]he number of electors shall be equal to the number of Senators and Representatives to which the several States are by law entitled at the time when the President and Vice President to be chosen come into office." 3 U.S.C. § 3. Thus, any change in the number of congressional representatives to which a state is entitled results in a corresponding change in the number of presidential electors to which it is entitled.

*Allocation of Federal and Private Funds*: The amount of certain federal and private funds a state receives also depends in large measure on the state's total population as determined by the decennial census. (Doc. # 1 at 18-20, ¶¶ 73-86). Many federal programs rely on the population figures generated by the decennial census to allocate funds to state and local governments. (*Id.* at 18, ¶ 74). For example, the Highway Trust Fund provides grants to states for road construction and other surface transportation programs, which are calculated on the basis of local population estimates collected through the decennial census. (*Id.* at ¶ 75) (citing 23 U.S.C. § 104(d)(3)). In fiscal year 2015, Alabama received $756 million in Highway Trust Fund grants. (*Id.* at ¶ 76). Numerous other federal programs, through which Alabama receives millions of dollars each year, also rely on population data from the decennial census to allocate funds among states. (*Id.* at 19, ¶¶ 77-80). Additionally, the Department of Commerce estimates that census data guides trillions of dollars in private-sector investment, and nonprofit organizations often use census data to decide where to provide critical aid like health care and disaster relief. (*Id.* at 19-20, ¶¶ 83-84). Thus, state population figures as determined by the decennial census have the potential to alter the amount of private sector investment and nonprofit aid a state receives.

In conducting the census, the Secretary of Commerce endeavors to count every single person living in the United States, without regard to citizenship or legal resident status. (Doc. # 1 at 7-8, ¶¶ 16-19). By regulation, citizens of foreign countries living in the United States (including those here illegally) are counted "at the U.S. residence where they live and sleep most of the time." Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525-01 at 5533 (Feb. 8, 2018). These individuals are then included in the total state population figures used for apportionment and Electoral College purposes (the "apportionment base"), regardless of whether they are legal residents of the United States. (Doc. # 1 at 8, ¶ 19-20). Thus,

when congressional seats and Electoral College votes are apportioned among the states, the apportionment base will include the illegal alien population of each state. (*Id.* at ¶ 20). By the same token, federal programs and private actors that rely on census population data to allocate funds and resources among the states will base their decisions on state population figures that include the illegal alien population of each state. (*Id.* at 19-20, ¶¶ 81, 85-86).

The State of Alabama and U.S. Representative Morris J. Brooks, Jr. (who represents Alabama's 5th congressional district) claim that the federal government's inclusion of illegal aliens in the apportionment base is unlawful. Specifically, they contend this practice violates (1) § 2 of the Fourteenth Amendment, (2) the Enumeration Clause of Article I, § 2, (3) the Electoral Apportionment Clause of Article II, § 1, and (4) the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), (C). (Doc. # 1 at 20, ¶ 87). And, more importantly for purposes of this opinion, Alabama and Representative Brooks claim they will be *injured* if the total state population figures from the 2020 census include the illegal alien population of each state. Alabama and Representative Brooks each allege two injuries they will suffer if the federal government is permitted to include illegal aliens in the final population figures following the 2020 census.

Alabama alleges it will suffer (1) a loss of political representation in Congress and the Electoral College and (2) the loss of federal and private funds it would otherwise have received. (Doc. # 1 at 15-20, ¶¶ 50-86). In particular, Alabama alleges that if illegal aliens are included in the final population figures used for congressional reapportionment, one congressional representative and one Electoral College vote will be reallocated from Alabama to a state with a larger illegal alien population. (*Id.* at 1-2, ¶ 1). Alabama further asserts that counting illegal aliens in the 2020 census will cause it to lose federal and private funds it would have received had illegal aliens been excluded from the count. (*Id.* at 19-20, ¶¶ 81, 85-86). According to

5

Alabama, funds it would have received will be redistributed to states that have disproportionately high illegal alien populations, because those states will show a much greater total population than they would if illegal aliens were excluded from the census. (*Id.* at 19, ¶ 81).

Representative Brooks' alleged injuries are (1) that his vote will be diluted due to Alabama's loss of political representation in Congress and the Electoral College and (2) that the congressional district he represents will be disrupted when Alabama loses one of its congressional seats. (*Id.* at 4, ¶ 2). In short, both of Representative Brooks' alleged injuries derive from and depend on Alabama losing one U.S. House seat in the reapportionment following the 2020 census.

## II.  Legal Standard

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. But not all disputes that might be termed "cases" or "controversies" in the colloquial sense count as Article III cases and controversies. The doctrine of standing serves to identify those disputes which qualify as Article III cases and controversies—that is, "those disputes which are appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

The test for determining whether a plaintiff has standing is familiar. "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. First, the plaintiff must have suffered an "injury in fact." *Id.* An injury in fact is "an invasion of a legally protected interest" which is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks removed). Second, the conduct complained of must have a causal connection to the plaintiff's injury. *Id.* This means the injury must be fairly traceable to the *defendant's* conduct, not the conduct of some third party not

6

before the court. *Id.* Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks removed).

At the pleading stage, courts evaluate standing based on the facts alleged in the complaint. *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019); *see also Lujan*, 504 U.S. at 561; *Made in the USA Found. v. United States*, 242 F.3d 1300, 1306 n.13 (11th Cir. 2001). Where a defendant mounts a "facial" challenge to standing -- one that relies solely on the face of the complaint rather than any extrinsic evidence -- courts must accept the allegations of the complaint as true. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335-36 (11th Cir. 2013). To satisfy its burden at the pleading stage, a plaintiff "must 'clearly allege facts demonstrating each element'" of standing. *Aaron*, 912 F.3d at 1336 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Moreover, a plaintiff's factual allegations must "plausibly" show that it has standing. *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175, 1184 (11th Cir. 2019). It is not enough that a complaint merely alleges facts from which a court could "*imagine* an injury sufficient to satisfy Article III's standing requirements." *Aaron*, 912 F.3d at 1336 (internal quotation marks omitted).

Finally, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). For that reason, only one of the two plaintiffs in this case needs to have standing for the court to reach the merits of this dispute. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007).

## III. Analysis

Alabama has alleged two injuries that potentially confer standing: (1) loss of representation in Congress and the Electoral College and (2) loss of federal and private funds.

Representative Brooks has also alleged two injuries: (1) vote dilution based on Alabama's loss of representation in Congress and the Electoral College and (2) disruption of the congressional district he represents based on Alabama's loss of a congressional representative. The court concludes that Alabama and Representative Brooks have adequately alleged standing based on their claimed representational injuries. Because the court finds standing based on Plaintiffs' claimed representational injuries, it need not consider whether the loss of federal and private funds or the disruption of Representative Brooks' congressional district would confer standing.

## A. Plaintiffs Have Adequately Alleged Standing Based on Their Claimed Representational Injuries

Alabama's congressional delegation currently consists of seven representatives and two senators, giving it a total of nine Electoral College votes. (Doc. # 1 at 16, ¶ 55). If illegal aliens are included in the apportionment base following the 2020 census, Alabama alleges it will lose one seat in the House of Representatives and thus one Electoral College vote. (*Id.* at ¶¶ 56-57). As a result of having six representatives instead of seven, each representative from Alabama will represent 810,546 constituents on average, instead of the roughly 694,754 constituents each representative currently represents. (*Id.* at 17, ¶¶ 65, 70). By being forced to vote in a district that is more populous that it otherwise would be, Representative Brooks (who is a registered voter in Alabama) claims his vote will be diluted. (*Id.* at 4, ¶ 2).

As previously noted, the court must determine whether Plaintiffs have plausibly alleged all three elements of standing: injury in fact, causation, and redressability. As explained below, the court holds that Plaintiffs have satisfied their burden at the pleading stage with respect to all three elements.

**1.  Plaintiffs Have Adequately Alleged Cognizable Article III Injuries**

The Supreme Court has repeatedly held that the loss of a congressional representative is a cognizable Article III injury, both for the state (which loses representation in Congress and the Electoral College) and its voters (whose votes are diluted). *See Franklin v. Massachusetts*, 505 U.S. 788, 801-03, 824 (1992); *Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331 (1999); *Utah v. Evans*, 536 U.S. 452, 458-64 (2002).

In *Franklin*, Massachusetts and two of its registered voters challenged the Secretary of Commerce's decision to allocate overseas federal employees to their home states for purposes of congressional reapportionment following the 1990 census. 505 U.S. at 790-91. The Secretary's decision to count overseas employees as residing in particular states for apportionment purposes "altered the relative state populations enough to shift a Representative from Massachusetts to Washington." *Id.* at 791.  Five Justices in *Franklin* expressly agreed that the plaintiffs had established a cognizable Article III injury by showing that Massachusetts would have received an additional representative had the Secretary not allocated overseas federal employees to their home states for apportionment purposes. *Id.* at 801-03 (O'Connor, J., writing for a four-Justice plurality); *id.* at 824 (Scalia, J., concurring in part and concurring in the judgment).[2] Thus, *Franklin* establishes that the loss of a congressional representative is a cognizable Article III injury, both for the state and its registered voters.[3]

---

[2] Four other Justices reached the merits of the plaintiffs' claims but did not expressly opine on whether they had standing. *See Franklin*, 505 U.S. at 807-23 (Stevens, J., concurring in part and concurring in the judgment). If one accepts that, by implication and force of logic, these Justices were necessarily satisfied that the plaintiffs had standing, the total count of Justices who agreed the plaintiffs had suffered an injury in fact comes to nine. *See Utah*, 536 U.S. at 460 (explaining that the Stevens plurality in *Franklin* "saw no further standing obstacle").

[3] *See Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1335-36 (11th Cir. 2015) (ruling that because five Justices in a Supreme Court decision "agreed that applying Rule 23 to allow a class action for a statutory penalty created by New York law did not abridge, enlarge, or modify a substantive right," that holding was binding on the Eleventh Circuit); Bryan A. Garner et al., *The Law of Judicial Precedent* § 19, at 194 (2016) (observing that "statements, rules, or principles [in Supreme Court opinions] that have the support of a majority of

But even if there were some doubt that *Franklin* settled the issue (and really, there is not), the Supreme Court has squarely held in two subsequent cases that the loss of a congressional representative is a cognizable Article III injury. In *Department of Commerce*, the Court concluded that a state's expected loss of a representative following reapportionment conferred standing upon the state's *voters*, whose votes would be diluted by the loss of a representative. 525 U.S. at 330-32. There, residents of thirteen states (among other plaintiffs) claimed the Census Bureau's planned use of statistical sampling to apportion representatives among the states violated federal law. *Id.* at 327. The Court held that one of the plaintiffs, a resident of Indiana, "undoubtedly satisfie[d] the injury-in-fact requirement of Article III standing" based on evidence that "Indiana [was] virtually certain to lose a seat" if the Bureau used its planned sampling techniques. *Id.* at 331. "With one fewer Representative," the Court reasoned, "Indiana residents' votes will be diluted" (since its citizens would be forced to vote in more populous districts). *Id.* at 332.

Finally, in *Utah v. Evans*, Utah challenged a census practice that caused it to lose one congressional representative to North Carolina following the 2000 census. 536 U.S. at 458-59. Relying on *Franklin*, the Court unambiguously held that Utah had standing to challenge the practice based on its loss of a representative. *Id.* at 459-64.

Here, Alabama and Representative Brooks (who is a registered voter in Alabama) have clearly alleged that Alabama will lose a representative if illegal aliens are included in the apportionment base following the 2020 census. On its face, that allegation is entirely plausible and is supported by specific factual averments in the complaint. According to the complaint, including illegal aliens in the apportionment base will impact the distribution of seats in the

the [Justices] . . . bind lower courts . . . ."); *id.* § 20, at 206 (explaining that when no single opinion garners majority endorsement, lower courts should "reach the result with which a majority of the Justices who decided the relevant precedent would necessarily agree").

House of Representatives "because the United States' illegal alien population is both large and highly concentrated." (Doc. # 1 at 11, ¶ 33). Estimates suggest that there are more than 11 million illegal aliens living in the United States, and that most of those individuals live in only a few states. (*Id.* at 10-12, ¶¶ 30, 35-36). At various points in the past two decades, federal agencies have estimated that 73 percent of illegal aliens live in only ten states; over 61 percent in just six states; and half in just three states. (*Id.* at 11-12, ¶¶ 35-36). According to Plaintiffs, the federal government's practice of including millions of these unevenly distributed illegal aliens in the apportionment base has already caused other states to lose House seats in previous decennial apportionments. (*Id.* at 11-14, ¶¶ 33, 37-45).

House seats and Electoral College Vote changes between the states are part of a zero sum game. When one state gains a House seat (and a corresponding additional Electoral College vote), by force of mathematics, that gain must be balanced by the loss of a House seat (and Electoral College vote) in another state. In the 2000 apportionment, for example, Plaintiffs allege the inclusion of illegal aliens in the apportionment base caused Indiana, Michigan, and Mississippi to each lose one House seat they otherwise would have retained, and prevented Montana from receiving a House seat it otherwise would have gained. (*Id.* at 12-13, ¶ 42). Likewise in the 2010 apportionment, inclusion of illegal aliens in the apportionment base allegedly caused Louisiana, Missouri, and Ohio to each lose one House seat they otherwise would have retained, and again prevented Montana from receiving a House Seat it otherwise would have gained. (*Id.* at 13-14, ¶¶ 44-45).

Plaintiffs allege that inclusion of illegal aliens in the 2020 apportionment base will cause Alabama to suffer the same fate that other states with relatively low illegal alien populations have suffered in past apportionments. (*Id.* at 15-18, ¶¶ 50-72). Specifically, Plaintiffs allege that

an apportionment done using the method of equal proportions[4] will cause Alabama to lose one House seat if illegal aliens are included in the apportionment base. (*Id.* at 15-16, ¶¶ 51-58). To demonstrate that this will occur, Plaintiffs say all one must do is "remov[e] the estimated illegal alien population from each state's projected total population and recalculat[e] the allocation of seats in the House of Representatives using the method of equal proportions." (*Id.* at 15, ¶ 51). The detailed and plausible allegations Plaintiffs have provided readily satisfy their burden at the pleading stage to "clearly allege facts demonstrating" an injury in fact. *Aaron*, 912 F.3d at 1336 (internal quotation marks omitted).

The federal defendants do not dispute that, as a general matter, the loss of a representative is a cognizable Article III injury. They instead argue that Plaintiffs' alleged injuries are too speculative to confer standing because it is impossible to know at this point (*i.e.*, pre-census) whether Alabama will in fact lose a representative. (Doc. # 45-1 at 8-11). In Defendants' view, the very nature of the apportionment process makes it impossible for Plaintiffs to bring a pre-census challenge of this sort.

In particular, due to the nature of the apportionment process, Defendants contend Plaintiffs cannot show Alabama is in fact likely lose a congressional representative following the 2020 census if illegal aliens are included in the apportionment base. Under the method of equal proportions, Defendants explain, the number of House seats each state receives depends not just on the state's own population, but on the population of other states as well. (*Id.* at 10). And because it is impossible to know each state's projected total population (including the illegal alien population) in advance of the census, Defendants claim it is impossible to know with any certainty whether Alabama is likely to lose a House seat. (*Id.* at 10-11). And, as Defendants note,

---

[4] The "method of equal proportions" is the statutorily required method of congressional apportionment. *See* 2 U.S.C. § 2a(a). The Census Bureau has provided a detailed explanation of the method on its website. (Doc. # 1 at 15, ¶ 53).

purely speculative future injuries are insufficient to confer Article III standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410-14 (2013).

This objection might ultimately prove valid, but it must be raised in a motion for summary judgment (or at trial) rather than in a motion to dismiss. At the pleading stage, courts evaluate standing based on the facts alleged in the complaint. *Aaron*, 912 F.3d at 1336. And in facial challenges like this one, courts must accept the plausible factual allegations of a complaint as true. *Muransky*, 922 F.3d at 1184; *Houston*, 733 F.3d at 1335-36. Here, Plaintiffs have clearly and plausibly alleged that Alabama will lose one congressional representative following the 2020 census if illegal aliens are not excluded from the apportionment base. The mere fact that Plaintiffs' alleged injuries will occur in the future, when the 2020 apportionment occurs, is not enough to defeat standing. *See Dep't of Commerce*, 525 U.S. at 332 (explaining that "it is certainly not necessary for this Court to wait until the census has been conducted to consider" claims based on the expected future loss of a congressional representative).

At oral argument, Defendants attempted to distinguish *Department of Commerce* on the ground that the census practice challenged there (the Bureau's planned use of statistical sampling to supplement data obtained through traditional census methods, *see* 525 U.S. at 324) is different from the census practice challenged here (the Bureau's inclusion of illegal aliens in the apportionment base). But this difference is irrelevant to the standing inquiry. What matters for standing purposes is that in both *Department of Commerce* and this case, the plaintiffs brought a pre-census challenge alleging that a particular census practice would cause their state to lose a House seat. The Court found standing in *Department of Commerce* (and, to be sure, did so at the summary judgment stage). *Id.* at 330-32. That finding was based on the affidavit of an expert who determined that, under the Bureau's proposed plan, it was "a virtual certainty that Indiana

will lose a seat." *Id.* at 330. Here, at the pleading stage, the court must accept as true Plaintiffs'
clear and plausible allegation that Alabama will lose a House seat if illegal aliens are included in
the 2020 apportionment base, just as the Supreme Court accepted the expert affidavit in
*Department of Commerce* as true for purposes of summary judgment. Accordingly, Plaintiffs'
allegations of injury are sufficient survive Defendants' facial attack on standing.

The Supreme Court has taught us that it is Plaintiffs' burden to support each element of
standing "with the manner and degree of evidence required at the successive stages of the
litigation." *Lujan*, 504 U.S. at 561. At the summary judgment stage, that means Plaintiffs "can no
longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific
facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.*
(internal citation omitted). And at trial, of course, facts relevant to the standing inquiry "(if
controverted) must be supported adequately by the evidence adduced at trial." *Id.* (internal
quotation marks omitted). *Lujan*'s teachings are instructive here. Because this case is currently at
the pleading stage, now is not the time to decide whether Alabama will ultimately be able to
offer evidence *showing* that it will likely lose a congressional representative if illegal aliens are
included in the 2020 apportionment base. It is enough, for now, that Alabama has clearly and
plausibly *alleged* that it will.

## 2.   Plaintiffs' Alleged Injuries Are Fairly Traceable to Defendants' Conduct

There is no doubt Plaintiffs satisfy the second element of standing: their alleged injuries
are fairly traceable to Defendants' challenged conduct in this case. It is the federal defendants'
decision to count illegal aliens in the 2020 census and include those individuals in the 2020
apportionment base that Plaintiffs allege will lead to Alabama losing a congressional
representative. The Supreme Court has consistently found the causation element of standing

satisfied when plaintiffs challenge a census practice that they either (depending on the stage of litigation) show or plausibly allege will result in their state losing a congressional representative. *See Franklin*, 505 U.S. at 801-03 (four-Justice plurality); *id.* at 824 (Scalia, J., concurring in part and concurring in the judgment); *Dep't of Commerce*, 525 U.S. at 332; *Utah*, 536 U.S. at 459-64. And this case is no different. Plaintiffs have adequately alleged injuries that are fairly traceable to Defendants' decision to count illegal aliens in the 2020 census and include those aliens in the 2020 apportionment base.

### 3.  Plaintiffs' Alleged Injuries Would Likely Be Redressed by a Favorable Decision

The first two elements of standing are readily satisfied by plausible allegations that a particular census practice will cause a state to lose a congressional representative. But the third element, redressability, has previously been described by the Supreme Court as presenting a "thornier standing question" in this context. *Franklin*, 505 U.S. at 802 (plurality opinion). Thorny as that question may have once been, however, it has now been settled by binding Supreme Court and Eleventh Circuit precedent.

In *Franklin*, the Supreme Court failed to expressly resolve whether an injury such as the one Plaintiffs allege here could be redressed by a federal court order. There (as here), the plaintiffs sought to exclude certain individuals from the congressional apportionment base. (In *Franklin*, the plaintiffs sought to exclude overseas federal employees; here, Plaintiffs seek to exclude illegal aliens). The thorny redressability issue identified by the Court in *Franklin* arose from the President's role in the apportionment process.

By statute, the number of representatives each state is "entitled" to following reapportionment is determined by a "statement" that the President must "transmit" to Congress. 2 U.S.C. § 2a(a), (b). The President's statement must show "the whole number of persons in each

15

State . . . as ascertained under the . . . decennial census" and "the number of Representatives to which each State [is] entitled" under the method of equal proportions. *Id.* § 2a(a). And it is not until the President transmits his statement to Congress that representatives are finally apportioned to the states. *Id.* § 2a(b).

Prior to the President transmitting his statement to Congress, another federal statute requires the Secretary of Commerce to submit to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b). But, as the *Franklin* Court recognized, the President is not bound to follow the Secretary's tabulation of the states' total populations, at least insomuch as the Secretary's tabulation rests on "policy judgments" concerning how best to determine the total population of each state. 505 U.S. at 799 ("To reiterate, § 2a does not curtail the President's authority to direct the Secretary in making policy judgments that result in 'the decennial census'; he is not expressly required to adhere to the policy decisions reflected in the Secretary's report."). Because the President is not necessarily bound to follow the Secretary's tabulation, "the action that creates an entitlement to a particular number of Representatives . . . is the President's statement to Congress, not the Secretary's report to the President." *Id.* at 797.

Given the President's critical role in the apportionment process, it would be natural to conclude that the only way to redress an injury based on the (allegedly improper) inclusion of certain individuals in the apportionment base would be an order requiring the *President* to exclude the relevant individuals from the apportionment base used to generate his statement to Congress. After all, as the President is not required to accept the Secretary's tabulation of state populations (at least to the extent the tabulation is based on "policy decisions", *id.* at 799), and as a state is not entitled to a particular number of representatives until the President transmits his

16

statement to Congress, simply requiring the Secretary to change the apportionment base would not itself ensure relief. (To put it bluntly, the argument goes like this: even if the Secretary were ordered to exclude the relevant individuals from the apportionment base, the President could always choose to include them.)

That relief against the President was deemed necessary in order to redress Massachusetts' loss of a representative was evidently precisely the reason the district court in *Franklin* included the President in its order granting relief. The district court there entered an injunction both directing the Secretary to exclude the overseas federal employees from the apportionment base *and* ordering the President to amend his statement based on the new apportionment base and retransmit his new statement to Congress, thereby ensuring that Massachusetts would regain its lost representative. *Id.* at 791, 802.

Though the district court's order in *Franklin* no doubt redressed the plaintiffs' injury, there was one problem: the district court had entered an injunction against a *sitting President*, which was "extraordinary, and should have raised judicial eyebrows." *Id.* at 802 (plurality opinion). The plurality in *Franklin* explained that, while it was an open question whether "the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty," there was little doubt that "'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" *Id.* at 802-03 (quoting *Mississippi v. Johnson*, 71 U.S. 475, 498-99, 501 (1866)). Justice Scalia, concurring in the judgment, agreed: "It is a commentary upon the level to which judicial understanding—indeed, even judicial awareness—of the doctrine of separation of powers has fallen, that the District Court entered this order against the President without blinking an eye. I think it clear that no court has authority to direct the President to take an official act." *Id.* at 825.

But if only relief against the President could ensure Massachusetts would regain its lost representative, and if the federal courts were powerless to order that relief, how could Massachusetts' injury be redressed? Here the *Franklin* plurality and Justice Scalia parted ways. The plurality thought there was no need to decide "whether injunctive relief against the President was appropriate," because, in any event, the plaintiffs' injury was "likely to be redressed by declaratory relief against the Secretary alone." *Id.* at 803. In the plurality's view, Massachusetts' loss of a representative was redressable because it was "substantially likely" that the President and other government officials "would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." *Id.* Justice Scalia disagreed. In his view, "[i]f courts may simply assume that everyone (including those who are not proper parties to an action) will honor the legal rationales that underlie their decrees, then redressability will *always* exist." *Id.* at 825. For Justice Scalia, redressability required "that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Id.* And, because no court had authority to enjoin the President with respect to his official conduct, Justice Scalia believed no court could redress Massachusetts' injury through the exercise of its power. *Id.*

In *Franklin*, therefore, there was no controlling five-Justice opinion regarding whether Massachusetts' loss of a representative was redressable.[5] Nearly a decade after *Franklin*, however, the Eleventh Circuit confronted a similar redressability issue and adopted the *Franklin* plurality's reasoning. *See Made in the USA*, 242 F.3d at 1308-09. In *Made in the USA*, a group of

---

[5] Curiously (as noted above), a separate four-Justice plurality in *Franklin* reached (and rejected) the merits of the plaintiffs' claims, but did not join the section of Justice O'Connor's opinion finding that plaintiffs had standing (and that their injury was redressable). *Franklin*, 505 U.S. at 807-23 (Stevens, J., concurring in part and concurring in the judgment). Arguably, therefore, those four Justices must necessarily have agreed that Massachusetts' injury was redressable, even though they did not expressly say so.

national and local labor organizations challenged the North American Free Trade Agreement ("NAFTA") as unconstitutionally void because it was never approved by the constitutionally prescribed procedures governing treaty ratification, *see* Article II, § 2. 242 F.3d at 1302. The plaintiffs alleged they had been injured by NAFTA's enactment due to "lost jobs, reduced wages and bargaining power, as well as diminished capacity to buy American-made products." *Id.* at 1306 n.13. Among the relief plaintiffs sought was "an order directing the President to notify the governments of Mexico and Canada that the United States would be terminating its participation in NAFTA within thirty days." *Id.* at 1307. Naturally, the government responded by arguing that the plaintiffs' injuries were not redressable because federal courts "lack[ ] the requisite authority to order the President to notify Mexico and Canada of this nation's withdrawal from NAFTA." *Id.* at 1308.

The Eleventh Circuit rejected the government's redressability argument, however, "relying chiefly on the reasoning employed in the plurality portion of the Court's opinion in" *Franklin*. *Id.* at 1309. Even though the Eleventh Circuit panel accepted that there was "serious doubt as to whether courts have the power to direct or enjoin the President in the performance of his official duties," the court found redressability under the plurality's reasoning in *Franklin* because "there are numerous subordinate executive officials engaged in the continued operation and enforcement of NAFTA's provisions" against whom relief could be ordered. *Id.* at 1310 & n.25. The court found "persuasive" the reasoning of the D.C. Circuit that relief against lower executive-branch officials can be "sufficient for redressability" even if "the President has the power, if he chose, to undercut [that] relief." *Id.* (internal quotation marks omitted). Thus, the court concluded, "even short of directly ordering the President to terminate our nation's

participation in NAFTA, a judicial order instructing subordinate executive officials to cease their compliance with its provisions would suffice" to redress the plaintiffs' injuries. *Id.* at 1310-11.

Under *Made in the USA* (which is binding precedent), it seems clear that Plaintiffs in this case can establish redressability if there are subordinate executive-branch officials against whom "partial relief" may be obtained. *Id.* at 1310. And to be sure, there are—Plaintiffs here seek relief against both the Secretary of Commerce and the Acting Director of the Census Bureau, two federal officials charged with conducting the census. *If* Plaintiffs succeed on the merits of their claims, the court can award them their requested relief and enter a judgment against those officials declaring it unlawful to include illegal aliens in the apportionment base following the 2020 census. *See* 28 U.S.C. § 2201 (codification of the Declaratory Judgment Act); (Doc. # 1 at 34, ¶ 158b) (Plaintiffs' prayer for relief). Plaintiffs' claimed injuries are therefore redressable under *Made in the USA*.

And were there any doubt that *Made in the USA* settled the redressability issue (at least in this Circuit), the Supreme Court has since clarified in no uncertain terms that states have standing to challenge census practices that cause them to lose a congressional seat, notwithstanding the statutory provisions that vest the President with the authority to issue the "statement" that ultimately determines each state's congressional delegation. *See Utah*, 536 U.S. at 459-64. In *Utah*, that state challenged a census counting practice that caused it to lose one congressional representative to North Carolina following the 2000 census. *Id.* at 458-59. Specifically, the Census Bureau had included an additional 1.2 million people in the apportionment base by inferring that certain addresses about which the Bureau had been unable to obtain population information likely had the same population characteristics as those of a nearby sample address about which the Bureau *had* successfully obtained population

20

information. *Id.* at 457-58. The inclusion of those additional 1.2 million people in the apportionment base shifted a representative from Utah to North Carolina. *Id.* at 458. Utah sued, claiming it was unlawful for the Bureau to include the additional 1.2 million "imputed" people in the apportionment base. *Id.* at 459.

North Carolina (wishing to keep its extra representative) intervened in the case and argued that Utah lacked standing because its loss of a representative was not redressable by court-ordered relief. *Id.* at 459, 461. North Carolina made essentially the same argument as Justice Scalia did in *Franklin*: Because all the Court could do was order the Secretary of Commerce to submit a new report to the President with new apportionment figures (excluding the 1.2 million imputed persons), a court order would not, of its own force, change the number of representatives to which Utah was entitled—since the President could always choose not to accept the new figures and decline to transmit a new statement to Congress. *Id.* at 461-62.[6] But the Court rejected North Carolina's argument and held instead that a court order requiring the Secretary to revise his report to the President would sufficiently redress Utah's injury. *Id.* at 462-63. That was so, the Court said, because if the Secretary's new report required a representative to be shifted from North Carolina back to Utah, "the relevant calculations and consequent apportionment-related steps would be purely mechanical." *Id.* at 463. Further, it seemed to the *Utah* Court (just as it had to the *Franklin* plurality) "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision." *Id.* at 463-64 (internal quotation marks omitted). The court therefore concluded Utah's injury was redressable and held that the state had standing. *Id.*

---

[6] In *Utah* (which involved a post-census challenge), the President had already transmitted his initial statement to Congress. 536 U.S. at 461-62.

This case is materially indistinguishable from *Utah*. Here, as in *Utah*, Plaintiffs seek to exclude a certain group of people (illegal aliens) from the population base used to apportion congressional seats among the states. And, also as in *Utah*, Plaintiffs here seek merely "a declaration leading, or an injunction requiring," the Secretary to exclude the relevant class of persons from the apportionment base; they do not seek relief against the President himself. *Id.* at 463; (Doc. # 1 at 34, ¶ 158). Because the Supreme Court held Utah's injury redressable under these circumstances, Alabama's alleged injury is likewise redressable for purposes of Article III standing.

## IV. Conclusion

To state the obvious, the court today expresses no view on the merits of Plaintiffs' claim that including illegal aliens in the population base used to apportion congressional seats among the states violates federal law. It merely holds that Plaintiffs have adequately alleged facts sufficient to establish that they have Article III standing to assert that claim. For that reason, Defendants' motion to dismiss is due to be denied. A separate order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this June 5, 2019.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE