FILED

2021 Feb-17  PM 09:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| STATE OF ALABAMA, et al., | |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | Case No. 2:18-cv-00772-RDP |
| Defendants, | |
| DIANA MARTINEZ, et al., | |
| Defendant-Intervenors, | |
| and | |
| COUNTY OF SANTA CLARA, CALIFORNIA, et al., | |
| Defendant-Intervenors, | |
| and | |
| STATE OF NEW YORK, et al., | |
| Defendant-Intervenors. | |

**STATE AND OTHER GOVERNMENT DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' RESPONSE TO THIS COURT'S ORDER TO SHOW CAUSE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................1

ARGUMENT ................................................................................................................5

  I.  Plaintiffs Do Not Have Standing. .........................................................................5

    A.  Plaintiffs' alleged injuries are not concrete, particularized, or imminent.............6

      1.  Like in *Trump v. New York*, the census count is complete and
          plaintiffs face no concrete harm from census operations..............................6

      2.  As in *Trump*, Plaintiffs' alleged injuries still require significant
          "guesswork." ........................................................................................9

    B.  Plaintiffs have failed to show that their alleged injuries are redressable by
        a court order on the propriety of the Residence Rule. ..........................................13

  II.  Plaintiffs' Claims Are Not Ripe. ........................................................................17

CONCLUSION.............................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Already, LLC v. Nike, Inc.*,
 568 U.S. 85 (2013)..................................................................................................9

*City of Detroit v. Franklin*,
 4 F.3d 1367 (6th Cir. 1993) ..................................................................................16

*Clapper v. Amnesty International USA*,
 568 U.S. 398 (2013)................................................................................................9

*Department of Commerce v. New York*,
 139 S. Ct. 2551 (2019)...................................................................................6, 8, 15

*Department of Commerce v. U.S. House of Representatives*,
 525 U.S. 316 (1999).................................................................6, 8, 12, 14, 15

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992)..............................................................................................17

*Jacobson v. Florida Secretary of State*,
 974 F.3d 1236 (11th Cir. 2020) ....................................................................... 14-15

*Lewis v. Governor of Alabama*,
 944 F.3d 1287 (11th Cir. 2019) (en banc) .............................................5, 13, 14, 16

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)............................................................................................4, 5

*Ohio Forestry Association v. Sierra Club*,
 525 U.S. 726, 733 (1998)........................................................................................7

*Trump v. New York*,
 141 S. Ct. 530 (2020).................................................................................. *passim*

*Utah v. Evans*,
 536 U.S. 452 (2002)...............................................................................7, 8, 14, 17

**Constitutional Provisions**

U.S. Const. art. I, § 2...............................................................................................1

**Statutes**

2 U.S.C. § 2a ....................................................................................................... 2-3

13 U.S.C. § 4 ........................................................................................................... 1

13 U.S.C. § 141 ...................................................................................................1, 2

**Other Authorities**

Congressional Research Service, *Apportionment and Redistricting Following the 2020 Census* (updated Dec. 9, 2020), https://crsreports.congress.gov/product/pdf/IN/IN11360 ........................5

Executive Order, *Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to the Decennial Census*, 86 Fed. Reg. 7,015 (Jan. 20, 2021) .........................................1

U.S. Census Bureau, 2020 Census Operational Plan v4.0 (Dec. 2018), https://www2.census.gov/programs- surveys/decennial/2020/program-management/ planning-docs/2020-oper-plan4.pdf................................................................................1

U.S. Census Bureau, Census Bureau Statement on 2020 Census Data Collection Ending (Oct. 13, 2020), https://www.census.gov/newsroom/press-releases/2020/2020-census-data-collection-ending.html ....................................................................................4

U.S. Census Bureau, Census Bureau Statement on Apportionment Counts (Jan. 28, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-apportionment-counts.html....4

U.S. Census Bureau, Census Bureau Statement on Redistricting Data Timeline (Feb. 12, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html ................................................................................................4

## INTRODUCTION

State and other Government Defendant-Intervenors respectfully submit this brief in response to Plaintiffs' response (Doc. # 204) to this Court's January 8, 2021 Order to Show Cause (Doc. # 195) ("Order") and January 29, 2021 Text Order (Doc. # 203) ("Text Order") ("Orders").  The Court directed Plaintiffs to (1) show cause why, in light of the Supreme Court's decision in *Trump v. New York*, 141 S. Ct. 530 (2020), Plaintiffs' alleged injuries "are more than just 'predictions,'" Order at 2, and (2) address the implications of President Biden's Executive Order, *Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to the Decennial Census*, 86 Fed. Reg. 7,015 (Jan. 20, 2021) on "whether a ruling on the propriety of the Census Bureau['s] Residence Rule would redress (*i.e.*, cure)" those alleged injuries, Text Order.  Because, in light of *Trump*, Plaintiffs' alleged injuries are too speculative to confer standing and, in any event, are not redressable by a ruling by this Court on the lawfulness of the Residence Rule, the Court should dismiss this lawsuit.

## BACKGROUND

The Constitution requires an "actual Enumeration" of the population every ten years to count "the whole number of persons in each State," in order to apportion Members of the House of Representatives among the states.  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.  Congress has assigned its duty to conduct the decennial enumeration to the Secretary of Commerce and Census Bureau.  13 U.S.C. §§ 4, 141(a).  To carry out this mandate, the Bureau conducts extensive planning each decade and promulgates various criteria that govern census operations.[1]

---

[1] *See* U.S. Census Bureau, 2020 Census Operational Plan v4.0 (Dec. 2018), at https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan4.pdf.

Among these enumeration procedures is the Final 2020 Census Residence Criteria and Residence Situations, which was finalized in February 2018 and is used to "determine where people are counted during each decennial census."  83 Fed. Reg. 5525, 5526 (Feb. 8, 2018).  This procedure (the "Residence Rule") provides that the state and specific location where each person resides are "determined in accordance with the concept of 'usual residence,'" which the Census Bureau defines as "the place where a person lives and sleeps most of the time."  *Id.*  As relevant here, the Residence Rule requires that citizens of foreign countries living in the United States be counted "at the U.S. residence where they live and sleep most of the time," without regard for their immigration status.  *Id.* at 5533 (Section C.3); *see also id.* at 5530.  "Throughout the Nation's history, the figures used to determine the apportionment of Congress — in the language of the current statutes, the 'total population' and the 'whole number of persons' in each State — have included every person residing in the United States at the time of the census, whether citizen or non-citizen and whether living here with legal status or without."  *New York v. Trump*, No. 20-CV-5770, 2020 WL 5422959, at *1 (S.D.N.Y. Sept. 10, 2020), *vacated and remanded*, 141 S. Ct. 530 (2020); *see also* Census Act of 1790, Ch. 2, § 5, 1 Stat. 101, 103 (counting "inhabitants" at "usual place of abode" or "usual residence").  In short, since the Founding, the population base used to apportion seats in the House of Representatives has never excluded any resident based on immigration status.

After the Secretary takes a "decennial census of population," the Secretary then "must report to the President '[t]he tabulation of total population by States' under the census 'as required for the apportionment.'"  *Trump*, 141 S. Ct. at 534 (quoting 13 U.S.C. § 141(b)).  The President then "must transmit to Congress a 'statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained' under the census."  *Id.*  (quoting 2 U.S.C.

§ 2a(a)).  "In that statement, the President must apply a mathematical formula called the 'method of equal proportions' to the population counts in order to calculate the number of House seats for each State."  *Id.*  The clerk of the House then transmits to each State "a certificate of the number of Representatives to which such State is entitled."  2 U.S.C. § 2a(b).

The State of Alabama and U.S. Representative Morris J. Brooks, Jr. filed this lawsuit in May 2018 seeking to vacate and set aside the Residence Rule on the ground that including undocumented immigrants in the total population count resulting from the decennial census violates the Administrative Procedure Act and the U.S. Constitution.  Compl. ¶¶ 140-157 (Doc. # 1).  Plaintiffs filed an amended complaint in September 2019 alleging that the Residence Rule injures them solely by causing representational harm, specifically that incorporating undocumented immigrants "into the population count utilized for apportionment will likely result in the State of Alabama losing a seat in the House of Representatives and a vote in the Electoral college," and "will reduce representational inequality [sic] between Alabama and the states that gain from the inclusion" of undocumented immigrants.  *See* Am. Compl. ¶¶ 50, 72 (Doc. # 112).  Plaintiffs allege that "[t]he effects of illegal immigration on congressional and electoral apportionment can be accurately measured by removing the estimated illegal alien population from each state's projected total population and recalculating the allocation of seats in the House of Representatives using the method of equal proportions," *id.* ¶ 51, and that Alabama will retain its seventh seat in the House of Representatives and its nine votes in the Electoral College if undocumented immigrants are excluded from the 2020 Census population figures used for apportionment.  *Id.* ¶¶ 58-59.

To redress their alleged injuries, Plaintiffs seek declaratory and injunctive relief declaring that the Residence Rule is unlawful, declaring that any apportionment of the "House of

Representatives conducted pursuant to 2 U.S.C. § 2a by the Secretary of Commerce that does not use the best available methods to exclude [undocumented immigrants] from the apportionment base used to apportion congressional seats and Electoral College votes among the states would be unconstitutional," and vacating and remanding the Residence Rule to the "Department of Commerce and the Census Bureau[ ] to permit the Defendants to issue rules that comply with the Constitution, the APA, and governing statutes." *Id.* ¶ 144.

On June 5, 2019, the Court held that Plaintiffs had adequately alleged standing based on their representational injuries. *See* Order (Doc. # 84). The Court noted that "it is Plaintiffs' burden to support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* at 14 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

On October 15, 2020, the Census Bureau concluded self-response and field data collection operations for the 2020 Census.[2] The timing of the Bureau's release of apportionment count data has been delayed on several occasions and remains uncertain. On January 28, 2021, the Bureau announced that it now predicts that it will complete apportionment counts on April 30, 2021.[3] On February 12, 2021, the Bureau announced that because "COVID-19-related delays and prioritizing the delivery of the apportionment results delayed the Census Bureau's original plan to deliver the redistricting data to the states by March 31, 2021," it now expects to deliver redistricting data to all states by September 30, 2021.[4] The Bureau has not announced

---

[2] *See* U.S. Census Bureau, Census Bureau Statement on 2020 Census Data Collection Ending (Oct. 13, 2020), https://www.census.gov/newsroom/press-releases/2020/2020-census-data-collection-ending.html.

[3] *See* U.S. Census Bureau, Census Bureau Statement on Apportionment Counts (Jan. 28, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-apportionment-counts.html.

[4] *See* U.S. Census Bureau, Census Bureau Statement on Redistricting Data Timeline (Feb. 12, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html.

when, following the finalization of the apportionment count, the Secretary of Commerce will deliver the final apportionment counts to the President.  The State and other Government Defendant-Intervenors are unaware of any estimated dates by which the President will deliver the apportionment count and seats per state to the House, or when the Clerk of the House will provide apportionment information to state officials.  These remaining steps will all presumably occur sometime between the predicted finalization of the apportionment count on April 30 and the anticipated release of legislative redistricting data to the states on September 30.[5]

## ARGUMENT

The Supreme Court's decision in *Trump v. New York* makes clear that Plaintiffs cannot establish standing to assert their claims because whether they will suffer their alleged injuries will remain unknowable until after the Census Bureau's release of apportionment count data later this year, and that, even if they could establish standing, their claims are not ripe.  *Trump*, 141 S. Ct. at 535.  Because Plaintiffs fail to satisfy these basic Article III justiciability requirements, *id.*, their case should be dismissed without prejudice with leave to renew their claims later if their alleged injuries become concrete following the release of the apportionment count data.

## I.    Plaintiffs Do Not Have Standing.

To establish standing, a plaintiff "must demonstrate that [it] has suffered an 'injury in fact'—an invasion of a legally protected interest that is both (a) 'concrete and particularized' and (b) 'actual or imminent, not conjectural or hypothetical."  *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (quoting *Lujan*, 504 U.S. at 560); *see also Trump*, 141 S. Ct. at 535.  The injury must be traceable to the defendant's conduct and redressable by the

---

[5] *See* Cong. Research Serv., *Apportionment and Redistricting Following the 2020 Census* 1-3 & fig. 1 (updated Dec. 9, 2020), https://crsreports.congress.gov/product/pdf/IN/IN11360 (describing normal sequence and timing of release of apportionment data and delays in the 2020 Census).

requested relief. *Id.* Here, Plaintiffs failed (1) to establish that their speculative future injury—the potential loss of Alabama's seventh House seat following reapportionment—is "substantially likely" to occur, *Trump*, 141 S. Ct. at 535, or (2) to meet their burden of showing those injuries, if they were to materialize, are redressable by this Court.

> **A.      Plaintiffs' alleged injuries are not concrete, particularized, or imminent.**

Plaintiffs' only claim of harm is based on asserted representational injury to Alabama. At present, however, any threat of such representational injury from the operation of the Residence Rule is not concrete, particularized, and imminent.

> **1.      Like in *Trump v. New York*, the census count is complete and plaintiffs face no concrete harm from census operations.**

In *Trump v. New York*, the Supreme Court recognized that, for standing purposes, there is a distinction between challenges in which "the Secretary has [ ] altered census operations in a concrete manner that will predictably change the count," 141 S. Ct. at 536 (citing *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565-66 (2019) ("*Dep't of Commerce*") and *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999) ("*U.S. House*")), and challenges in which the census count "is complete" and "the apportionment process . . . is at a preliminary stage." *Id.* The former type of claim was at issue in *Department of Commerce*. There, plaintiffs challenged the planned addition of a citizenship question to the 2020 Census questionnaire and sought relief to alter the forthcoming conduct of the census. 139 S. Ct. at 2561. The Supreme Court held that the "predictable effect" of the addition of the citizenship question conferred standing on the plaintiffs, and that plaintiffs' injuries were plainly redressable because the defendants in that case could be ordered not to include the citizenship question. *See id.* at 2565-66. By contrast, the latter type of claim was at issue in *Trump* where plaintiffs objected to the potential exclusion of undocumented immigrants from the population count used

for apportionment purposes.  141 S. Ct. at 534.  The Supreme Court held that plaintiffs were not suffering any present harm, and had not made a sufficiently concrete showing of future representational injury.  *Id.* at 536-37.

At this juncture, Plaintiffs' dispute is more analogous to the challenge in *Trump* than the challenge in *Department of Commerce* or the other pre-apportionment cases that the Supreme Court distinguished.  As in *Trump*, "the count here is complete."  *Trump*, 141 S. Ct. at 536.  Self-response and field-data collection operations for the 2020 Census ended on October 15, 2020. *See supra* at 4.  Currently, the Census Bureau predicts that it will not finalize apportionment data until April 30, 2021, with the release of that data to the President, House, and state presently unknown.  *See supra* at 4-5.  As in *Trump*, there is no doubt that at the very least the dispute here "will take a more concrete shape once the Secretary delivers his report under § 141(b)" to the President, *Trump*, 141 S. Ct. at 535, since Alabama will not know to any degree of certainty whether it will retain or lose its seventh House seat until then.

At present, as in *Trump*, "[P]laintiffs suffer no concrete harm from the challenged policy itself, which does not require them 'to do anything or to refrain from doing anything.'"  *Trump*, 141 S. Ct. at 536 (quoting *Ohio Forestry Ass'n v. Sierra Club*, 525 U.S. 726, 733 (1998)). Indeed, Plaintiffs admit as much.  *See* Pls.' Br. at 10.  Plaintiffs attempt to analogize the relief that they seek to the relief ordered in *Utah v. Evans*, 536 U.S. 452 (2002), explaining that the "'relevant calculations and consequent apportionment-related steps'" they request to redress their alleged injuries "'would be purely mechanical; and several months would remain prior to the first post-20[20] census congressional election.'"  Pls.' Br. at 10 (quoting *Evans*, 546 U.S. at 463).  But in *Evans*, Utah challenged the Census Bureau's use of "hot deck imputation" "*after* the census was complete," and *after* the apportionment process was completed by the

transmission to Utah of the certificate under 2 U.S.C. § 2a(b) showing the number of Representatives that it would be allocated.  536 U.S. at 460 (emphasis added).  The actual, rather than speculative, loss of a seat gave Utah standing to sue.  *Id.*

In contrast, the pre-apportionment cases that the Supreme Court distinguished in *Trump* involved challenges to the Census Bureau's operations that had not yet been executed (let alone completed), and that presented a risk of irreparable harm to Plaintiffs that would be difficult or impossible to remedy after such operations were complete.  In *Department of Commerce*, Plaintiffs' injuries "all . . . turn[ed] on their expectation that reinstating a citizenship question" on the 2020 Census questionnaire would "depress the census response rate and lead to an inaccurate population count."  139 S. Ct. at 2565.  The injury the plaintiffs alleged stemmed from the Census Bureau's operations to ascertain the count—specifically, the harm that would result from the inclusion of a citizenship question on the Census questionnaire.  *Id.*  When the challenge reached the Supreme Court, the census questionnaire was not yet finalized, and the Court accordingly had the ability to alter the Census Bureau's operations for the 2020 Census in a manner that would redress the plaintiffs' alleged injuries, *i.e.*, by ordering the removal of the citizenship question from the questionnaire before the count took place.  *Id.*  Likewise, in *U.S. House*, the Supreme Court found that the threat of vote dilution to plaintiffs through the Census Bureau's use of sampling was concrete and imminent because it was "clear that if the Bureau [was] going to alter its plan to use sampling in the 2000 census, it must begin doing so by March 1999."  525 U.S. at 332.  The Court found that it was not necessary "to wait until the census had been conducted to consider the issues presented here, because such a pause would result in extreme—perhaps irremediable—hardship."  *Id.*

Plaintiffs try to distinguish *Trump* by drawing a categorical line between challenges to the "apportionment process" and challenges to "census operations."  Pls.' Br. at 4.  But that distinction ignores the "foundational principle of Article III [ ] that 'an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation.'"  *Trump*, 141 S. Ct. at 534 (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90-91 (2013)).  Now that the Census count is complete, Plaintiffs can no longer point to any concrete harm from census operations permitting judicial intervention.  If Plaintiffs can establish concrete injury when the apportionment process is complete, they could pursue their claims in a separate lawsuit then.

### 2. As in *Trump*, Plaintiffs' alleged injuries still require significant "guesswork."

Far from establishing a "'significant risk' of reduced representation," *Trump*, 141 S. Ct. at 535-36 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)), Plaintiffs' conclusion that they will suffer representational injuries because of the Residence Rule "involves a significant degree of guesswork," *id.* at 536.

*First*, while Alabama claims that it may lose a House seat during the apportionment process,[6] that outcome remains highly uncertain because of Alabama's projected position to retain or lose a seat, and the unique circumstances of the 2020 Census.  Various estimates by the parties' experts show that Alabama is on the cusp of retaining or losing its seventh House seat, an outcome that will hinge on a variety of factors, only one of which may be the inclusion of

---

[6] *See* Sworn Decl. & Second Suppl. Expert Report of Dudley L. Poston, Jr. Ph.D., at 3 (Feb. 4, 2021) (Doc. # 204-1) ("Poston Second Supp. Report").

undocumented persons in the count.[7]  Even minor variations from population estimates in the 50 states—which could arise from, among other things, atypical and uneven residential mobility or mortality rates between and among the states because of COVID-19[8]—will likely spell the difference between Alabama keeping or losing a seat when the actual, final counts are known. Actual future apportionment of House seats is susceptible to small changes in the population in the 50 states.[9]  As Kimball W. Brace, one of Defendant-Intervenors' experts, explains, "[a]ny state that falls into seat ranges 429 through 440, particularly if they gained or lost the seat by under 50,000 people, could very possibly change when new numbers become available."[10]  This risk is amplified for Alabama given its position in line to retain or lose its seventh seat.

The Census Bureau's own population estimates confirm this uncertainty.  The Bureau's most recent population estimates for July 2020, adjusted to April 1, 2020, indicate that Alabama stands to rank 436th in line for the 435 congressional seats available,[11] and to lose its seventh House seat by a margin of only approximately 5,000 people.[12]  But the unadjusted July 2020 estimates show that Alabama would rank 435th in line for a seat,[13] and therefore retain its seventh seat by a margin of approximately 6,000 people.[14]  There is simply no way to know

---

[7] *See* Election Data Services, New Population Estimates Point to Significant Issues in Recent Supreme Court Cases, Table 2 (Dec. 22, 2020) (Doc.. # 204-3) ("Brace Dec. 2020 Analysis"); Ex. 3 (Supplemental Report and Decl. of Kimball W. Brace (Feb. 17, 2021) ("Brace Supp. Report")) at 1, 4-5; Poston Second Supp. Report at 3; Ex. 2 (Expert Report & Decl. of Kimball W. Brace, at 3, 7-9, Ex. B (Mar. 13, 2020) ("Brace Report")); Ex. 4 (Sworn Decl. & Expert Rebuttal Report of D. Sunshine Hillygus, at 2-4 (Feb. 17, 2021) ("Hillygus Rebuttal")).

[8] *See* Hillygus Rebuttal at 3.

[9] *See* Brace Report at 7-8; Hillygus Rebuttal at 2-3.

[10] Brace Report at 8.

[11] Brace Dec. 2020 Analysis at Table 2; Brace Supp. Report at 4-5; Hillygus Rebuttal at 10; Poston Second Supp. Report at 3.

[12] Brace Dec. 2020 Analysis at Table 2; Brace Supp. Report at 4.

[13] Brace Dec. 2020 Analysis at Table 1; Brace Supp. Report at 5; Hillygus Rebuttal at 10.

[14] Brace Dec. 2020 Analysis at Table 1; Brace Supp. Report at 5.

whether Alabama will, in fact, lose a seat, or to show with any certainty that such loss would be attributable to the inclusion of undocumented persons in the apportionment count.[15]

Changes in census operations and the circumstances of the 2020 Census count make predictions regarding Alabama's risk of representational loss even more speculative.  The factors include that (1) the Census Bureau implemented a primarily online census for the first time, (2) the Bureau modified the way the military overseas population will be counted, and (3) the COVID-19 pandemic greatly affected how the Census was taken and where individuals resided on April 1, and most certainly will affect the apportionment results.[16]  For example, during the pandemic those that relocated more often moved out of states like New York—one of the states closest to Alabama in priority—to flee urban areas for less dense communities.[17]  Additionally, millions of college students were dislocated when their colleges were closed just as census operations were starting, disproportionately affecting states with large college student populations.[18]  The available evidence about population migration patterns, therefore, suggests "an *increased* likelihood that Alabama will retain seven House seats once the actual population enumeration is known."[19]  These uncertainties, coupled with Alabama's place in line to retain or lose its seventh seat, make it impossible to conclude with any certainty that Alabama is "substantially likely" to lose a seat at all, let alone *because of* the inclusion of undocumented immigrants in the apportionment count as opposed to any number of other factors.  Accordingly, in sharp contrast to the circumstances in *U.S. House of Representatives*, where Indiana was

---

[15] *See* Ex. 1 (Sworn Decl. and Expert Report of D. Sunshine Hillygus, at 3 (Mar. 13, 2020) ("Hillygus Report")); Hillygus Rebuttal at 1-2, 9; Brace Supp. Report at 4-5.

[16] *See* Brace Report at 8-12; Hillygus Rebuttal at 3.

[17] Hillygus Rebuttal at 3.

[18] *See id.*

[19] *Id*.

"virtually certain" to lose a seat under the Census Bureau's plans to use statistical sampling, 525 U.S. at 331, Plaintiffs' risk of representational loss is far from certain and cannot be known until the Census Bureau releases the apportionment count in several months.  At the very least, Plaintiffs' alleged harm "will take a more concrete shape once the Secretary delivers his report under § 141(b)."  *Trump*, 141 S. Ct. at 535.

*Second*, Plaintiffs' estimates regarding the undocumented population and any supposed effect of excluding undocumented immigrants from the 2020 Census count are also "riddled with contingencies and speculation," *Trump*, 141 S. Ct. at 535, because of the significant uncertainties over whether and to what extent the undocumented immigrant population can be counted in a manner precise enough to satisfy constitutional and statutory requirements.  As Defendant-Intervenors' expert, Dr. Sunshine Hillygus, explains in her report, there is "no reliable way" for the Census Bureau "to exclude undocumented immigrants from the 2020 apportionment count."[20]  *Cf. Trump*, 141 S. Ct. at 535 (explaining that the record in *Trump* "is silent on which (and how many) [undocumented immigrants] have administrative records that would allow the Secretary to avoid impermissible estimation").  Those uncertainties render any resulting projections imprecise and unreliable—including the estimates on which Plaintiffs' expert, Dr. Poston, relies to conclude that Alabama is likely to retain a seat if undocumented persons are excluded from the apportionment count.[21]

In his second supplemental report, Dr. Poston attempts to show, without explanation, that by excluding even a fraction of the estimated undocumented population, Alabama stands to

---

[20] Hillygus Report at 3; Hillygus Rebuttal at 1.

[21] *See* Poston Second Supp. Report at 3; Hillygus Report at 11-25; Hillygus Rebuttal at 4-9; Brace Report at 14-16. Dr. Hillygus and Mr. Brace responded to Dr. Poston's earlier expert analysis in this case, which involved using different sources of estimates for the undocumented immigrant population.  Dr. Poston's most recent analysis suffers from the same problems.  *See* Hillygus Rebuttal at 4-5.

retain its seventh seat in the House of Representatives.[22]  This analysis, however, is flawed in several respects.  First, the analysis is based on the 2020 projections of total population counts for each state, which, as described above are highly speculative.  Second, the number of people that Dr. Poston subtracts are based on estimates of the undocumented population unfit for apportionment purposes.[23]  Third, Dr. Poston assumes, without explanation or justification, that the proportion of undocumented immigrants in 2018 will remain constant for each state in 2020 despite the fact that there is variation in the undocumented population across states over time.[24]  Finally, the analysis fails to acknowledge that even if some population of undocumented immigrants could be identified for potential exclusion, that population would likely not "be equally proportional to the [undocumented immigrant] estimates across all 50 states."[25]  These issues all render any hypothesis about the theoretical effect of excluding undocumented immigrants on Alabama's ability to retain a seat highly speculative and unreliable.

> **B.    Plaintiffs have failed to show that their alleged injuries are redressable by a court order on the propriety of the Residence Rule.**

Because Plaintiffs have not shown a substantial likelihood of injury necessary for Article III standing, this Court need not consider whether Plaintiffs' injuries are redressable by the declaratory and injunctive relief they seek.  In any event, Plaintiffs have thus far failed to meet their burden of showing that their claimed injuries would be redressed by a judgment in their favor.  "Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power."  *Lewis*, 944 F.3d at 1305; *see also Jacobson v. Fla. Sec'y of State*, 974

---

[22] *See* Poston Second Supp. Report at 6-8.

[23] *See* Hillygus Report at 12-27; Hillygus Rebuttal at 5-6.

[24] *See generally* Hillygus Report at 12.

[25] Hillygus Rebuttal at 6.

F.3d 1236, 1254-55 (11th Cir. 2020) (quoting same).  "[T]he plaintiff must show that it is likely, not merely speculative, that a favorable judgment will redress her injury." *Lewis*, 944 F.3d at 1296.  Plaintiffs must show that "that redress is likely 'as a practical matter.'" *Jacobson*, 974 F.3d at 1255 (quoting *Evans*, 536 U.S. at 461).  And at the summary judgment stage, a plaintiff cannot rely just on allegations of redressability, but instead "must establish that there exists no genuine issue of material fact as to justiciability on the merits." *U.S. House*, 525 U.S. at 329.

Here, Plaintiffs' alleged representational injury would be redressed only if a sufficiently large number of undocumented immigrants could be excluded to make a difference to the apportionment of House seats between the 50 states.  But Plaintiffs have failed to allege or show that a feasible method exists for the Bureau to accomplish this exclusion in numbers sufficient to affect the number of Representatives that Alabama will be allocated.  The Supreme Court identified similar methodological problems in reaching its jurisdictional holding in *Trump*, noting that "[e]veryone agrees by now that the Government cannot feasibly implement the memorandum by excluding the estimated 10.5 million aliens without lawful status."  141 S. Ct. at 536.  As the Court found, the Trump Administration's challenged policy requiring the exclusion of undocumented persons from the census count "may not prove feasible to implement in any manner whatsoever," since, among other things, a "conjectural estimate" of undocumented persons would be unconstitutional, serious questions existed as to whether the Bureau had sufficient administrative records "that would allow the Secretary to avoid impermissible estimation, and whether the Census Bureau can even match the records in its possession in a timely manner," and that "[u]ncertainty likewise pervades which (and how many) aliens the President will exclude from the census if the Secretary manages to gather and match suitable records."  141 S. Ct. at 535.  These same uncertainties undermine Plaintiffs' contention

here that their requested relief—the same uncertain exclusion of undocumented persons that the now-abandoned Trump Administration policy contemplated—would "likely" redress their asserted representational injury.

Plaintiffs have identified no concrete solution to the methodological problems identified by the Supreme Court in *Trump* that would warrant a different conclusion as to jurisdiction here. First, as the Supreme Court found in *Trump*, the availability and utility of administrative records to exclude undocumented persons from the count within constitutional and statutory bounds is uncertain.  *Id.*  In designing the Census, the Census Bureau rejected the use of administrative records for the total-population count as "inadequate because they were missing for more than 10% of the population."  *Dep't of Commerce*, 139 S. Ct. at 2563.  The lack of records is likely more pronounced for the undocumented population: as Dr. Hillygus explains, the federal government lacks administrative records for many undocumented individuals.[26]  Second, the Bureau is barred from using statistical sampling in completing the enumeration for apportionment purposes.  *U.S. House*, 525 U.S. at 343; *cf. Trump*, 141 S. Ct. at 535 (noting actual enumeration, not estimates, are constitutionally required).  Third, the Supreme Court barred the Census Bureau from asking a citizenship question in the 2020 Census, making any resulting data from that question unavailable.  *Dep't of Commerce*, 139 S. Ct. at 2576.

Perhaps recognizing that there is no viable way for the Bureau to exclude all undocumented persons from its "actual enumeration" of persons in the United States as of April 1, 2020, Plaintiffs suggest that only excluding *some* of them would redress their injuries.  Pls.' Br. at 11.  They contend that "if Defendants can lawfully remove just one out of every ten illegal aliens from the apportionment count, Alabama is substantially likely to retain its seventh seat."

---

[26] Hillygus Rebuttal at 5-6.

*Id.*  But the partial removal of undocumented persons from the apportionment count is itself unworkable and of dubious legality.  As Dr. Hillygus explains, there is no reliable way to fairly exclude some undocumented persons.[27]  One hypothetical approach—excluding individuals in immigration detention facilities—would fail because not all detained individuals are undocumented and the government does not know the immigration status of many detainees.[28] Moreover, the partial exclusion of detainees is untenable because it would fall unevenly and arbitrarily across states,[29] reducing the likelihood of an accurate state-by-state enumeration. Apportionment count adjustments based on a partial removal of undocumented persons from the count "would cause a mere shifting of unavoidable inequities and not a net improvement in accuracy," *City of Detroit v. Franklin*, 4 F.3d 1367, 1378 (6th Cir. 1993), where any potential benefits to Alabama would harm some other states.

In short, Plaintiffs have failed to identify *any* method for excluding undocumented persons from the apportionment count that is sufficiently reliable, accurate, and administrable to satisfy constitutional and statutory requirements.  Mere speculation that such a method exists— and that this method, if applied, would redress Plaintiffs' injuries—does not satisfy the requirement that a court-ordered remedy would "significantly increase the likelihood that [plaintiffs] would obtain relief that directly redresses the injury that [they] claim[] to have suffered."  *Lewis*, 944 F.3d at 1301 (citation, quotation marks, and modifications omitted).

Because the redressability of Plaintiffs' predicted injuries is, like the injuries themselves, "no more than conjecture at this time," Plaintiffs do not have standing.

---

[27] Hillygus Rebuttal at 5-9.

[28] *Id.* at 7-8.

[29] *Id.* at 10 (Table, Column L).

## II.      Plaintiffs' Claims Are Not Ripe.

As Plaintiffs correctly point out, "[a] case is 'ripe' when it does 'not depend[] on 'contingent future events that may not occur as anticipated, or indeed may not occur at all."  Pls.' Br. at 12 (quoting *Trump*, 141 S. Ct. at 535).  Plaintiffs err, however, in asserting that their claims no longer rely on uncertain contingencies.

Although it is now undisputed that Defendants will include undocumented immigrants in their yet-to-be-released apportionment counts, other significant contingencies remain that could altogether obviate Plaintiffs' claims.  *See supra* at 9-13.  First, the Census Bureau's release of apportionment data later this year that will definitively reveal whether Alabama will lose a Congressional seat.  Second, as the Supreme Court has recognized, "[p]re-apportionment litigation always 'presents a moving target' because the Secretary may make (and the President may direct) changes to the census up until the President transmits his statement to the House," *Trump*, 141 S. Ct. at 535 (quoting *Franklin v. Mass.*, 505 U.S. 788, 797-98 (1992)), provided, of course, that "any such changes . . . comply with the constitutional requirement of an 'actual Enumeration' of the persons in each state, as opposed to a conjectural estimate," *id.* (citing *Evans*, 536 U.S. at, 475-76).

Under the *Trump* analysis, several critical steps remain before Alabama's injury (if any) transforms from speculative to certain: the Bureau's release of apportionment data to the President, the President's decision on whether to direct any changes, the transmission of the President's statement to the House, and the House's transmission of certificates to the States.  *Id.* at 535.  The plaintiffs in *Trump* were at the same stage of the process when they brought their challenge to the potential exclusion of undocumented persons from the apportionment count; although Plaintiffs here challenge the opposite policy, the fact that they are at the same

"preliminary stage" of the apportionment process warrants a similar jurisdictional result.  *Id.* at 536.  As in *Trump*, until the Bureau completes and releases its apportionment count, and the President transmits his statement to the House, "making any prediction about future injury [is] just that—a prediction."  *Id.*  The case is not ripe for review.

## CONCLUSION

Because Plaintiffs do not have standing to challenge inclusion of undocumented persons in the Census Bureau's apportionment count and because their claims are not ripe, the Court should dismiss this action.

DATED:  February 17, 2021

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

/s/ Joyce White Vance
Joyce White Vance
101 Paul W. Bryant Drive
Tuscaloosa, AL 35487
jvance@law.ua.edu

By: /s/ Joseph J. Wardenski
Joseph J. Wardenski, *Senior Trial Counsel*
Amanda Meyer, *Assistant Attorney General*
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8441
Joseph.Wardenski@ag.ny.gov
Amanda.Meyer@ag.ny.gov

/s/ Barry A. Ragsdale
Barry A. Ragsdale
SIROTE & PERMUTT, PC
2311 Highland Avenue South
Birmingham, AL 35205
Phone: (205) 930-5100
Fax: (205) 930-5101
bragsdale@sirote.com

*Attorneys for the State and Other Government Defendant-Intervenors*

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2021, I electronically filed the foregoing State and Other Government Defendant-Intervenors' Response to Plaintiffs' Response to this Court's Order to Show Cause with the Clerk of the Court and served using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Joseph J. Wardenski
Joseph J. Wardenski