IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| STATE OF ALABAMA, et al., <br>     *Plaintiffs*, <br> v. <br> UNITED STATES DEPARTMENT OF COMMERCE; et al., <br>     *Defendants*, <br> and <br> DIANA MARTINEZ, et. al.; COUNTY OF SANTA CLARA, CALIFORNIA, et al.; and STATE OF NEW YORK, et al., <br>     *Defendant-Intervenors*. | Civil Action No. 2:18-cv-00772-RDP |

**PLAINTIFFS' REPLY TO DEFENDANTS' AND DEFENDANT-INTERVENORS' RESPONSES TO THE COURT'S JANUARY 8, 2021 SHOW CAUSE ORDER**

Plaintiffs respectfully submit this reply to address contentions raised by Defendants and Defendant-Intervenors in their briefs responding to the Court's show cause order (Doc. 195) and text order regarding President Biden's Executive Order from January 20, 2021, entitled "Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to the Decennial Census," (the "Biden Executive Order," or "Order") (Doc. 203). The parties press two broad arguments, neither of which has merit.

**I.     Defendants' and Defendant-Intervenors' evidentiary arguments at most demonstrate the need for more discovery.**

First, Defendants and Defendant-Intervenors argue that this Court should dismiss this case based on disputed facts and an incomplete record, but these factual disputes only underscore the need for discovery based on significant developments that have occurred between 2018 (when this

1

suit was filed) and today.  Defendants, for example, fault Plaintiffs' expert for offering an opinion regarding the ultimate apportionment count based "on estimates of state populations."  (Doc. 207 at 5).  Of course, these estimates come from the Census Bureau itself, and have been relied on by experts for the Defendant-Intervenors.  *See, e.g.*, Suppl. Expert Report & Decl. of Kimball Brace ¶¶6–10 (Feb. 17, 2021) (Doc. 208-3); Expert Decl. of Christopher Warshaw ¶10A (Aug. 7, 2020) (Doc. 204-2).  More importantly, the Census Bureau now has more accurate data at its disposal which can show with even greater certainty whether Alabama faces a substantial risk of losing its 7th Congressional seat.  Plaintiffs intend to obtain from Defendants their most current state-level data, and the Court should lift the stay and reopen discovery to allow Plaintiffs to obtain it.

The State and Local Government Defendant-Intervenors ("Government Intervenors" for short) make similar arguments.  They admit that "[v]arious estimates by the parties' experts show that Alabama is on the cusp of retaining or losing its seventh House seat." (Doc. 208 at 9).  But because "[t]here is simply no way to know whether Alabama will, in fact, lose a seat," in New York's view, this case must be dismissed.  (*Id.* at 10-11).  If the hurdle Plaintiffs had to clear was absolute certainty, we'd be out of luck.  But that is not the test.  Plaintiffs facing future harm from illegal government conduct need not possess a crystal ball before obtaining redress from a court.  Rather, they need show only "a substantial risk that the harm will occur."  *Dep't of Com. v. New York*, 139 S.Ct. 2551, 2565 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). And when everyone agrees that Alabama is on the cusp of losing a seat, and that Alabama has a far smaller percentage of illegal aliens than many other States that are (like New York) also on the cusp, there is clearly a "substantial risk" that Alabama will be harmed by including illegal aliens in the apportionment count.

The Government Intervenors next try to analogize this case to *Trump v. New York*, but they overlook a key difference between the two cases—this one is still ongoing while New York's was before the Supreme Court on a closed record.  New York's standing on appeal relied on "a significant degree of guesswork," (Doc. 208 at 9) (quoting *Trump v. New York*, 141 S. Ct. 530, 536 (2020)), because when New York was before the district court, it failed to develop a sufficient record on likely apportionment harms.  Instead, the district court adopted New York's other (more tenuous) standing theory that President Trump's "memorandum was chilling aliens and their families from responding to the census, thereby degrading the quality of census data used to allocate federal funds and forcing some plaintiffs to divert resources to combat the chilling effect." *Trump*, 141 S. Ct. at 534.  Whatever the merits of that theory before the district court, it failed on appeal because "any chilling effect from the memorandum dissipated upon the conclusion of the census response period."  *Id.*  Thus, New York fell back on its underdeveloped apportionment theory of standing, but "the only evidence speaking to the predicted change in apportionment unrealistically assume[d] that the President will exclude the entire undocumented population.  Nothing in the record addresse[d] the consequences of a partial implementation of the memorandum …." *Id.* at 536. Here, the record Plaintiffs have built is far stronger—indeed strong enough to show a substantial risk of harm flowing from implementation of the Residence Rule.

But again, and just as important, the record isn't complete.  Over the last two years, Defendants have developed records on citizenship; and over much of the last year, pursuant to President Trump's Memorandum, Defendants worked to identify illegal aliens in the census results. While Defendants suggest that "excluding all undocumented immigrants, or even just a portion of them, would hardly be a trivial matter," (Doc. 207 at 6), Defendants do not suggest it is impossible.  Rather, on November 30, 2020, Defendants represented to the Supreme Court that the

3

Census Bureau "will be able, I think, to" identify illegal aliens in "ICE facilities, which … is some number in the tens of thousands," and that Defendants would know whether they could identify more illegal aliens after the Census Bureau "take[s] the census master file and these various administrative records, once they're all cleaned up and ready to go, and … actually run[s] the models." Transcript of Oral Argument at 20–21, *Trump v. New York*, 141 S. Ct. 530 (2020) (No. 20-366). Thus, before the Court determines whether Plaintiffs' harms are redressable, Plaintiffs should be allowed discovery to determine how many illegal aliens Defendants have identified and can feasibly identify.

Moreover, since the census count ended in mid-October 2020, with "well over 99.9% of housing units" having been accounted for in the census,[1] Defendants have been processing that data. As recently as January 4, 2021, Defendants indicated in separate litigation that the apportionment numbers might be ready by as soon as February 9, 2021.[2] While the Census Bureau clearly failed to meet that deadline, on January 7, 2021, Defendants told the Northern District of California that they had produced the Decennial Response File 1 dataset, which involved "determining the final classification of each address as either a housing unit or a group quarters facility, identifying each unique person on all responses, determining the population count for all group quarters, linking continuation forms, and standardizing responses across our various collection modes (on-line, telephone, in person, etc.)." *See* Decl. of Deborah Stempowski ¶9, *Nat'l Urban League v. Ross*, No. 5:20-cv-5799 (Jan. 7, 2021), ECF No. 473-2. That put the

---

[1] *Census Bureau Statement on 2020 Census Data Collection Ending*, U.S. Census Bureau, Oct. 13, 2020, https://perma.cc/6PAU-5H3T.
[2] Mike Schneider, *Attorney: Congressional seat data not ready until February*, Associated Press, Jan. 4, 2021, https://perma.cc/9UH3-46TZ.

Census Bureau close to producing the Census Unedited File, which is the dataset from which the Census Bureau "produce[s] the apportionment counts." *Id.* ¶14. Thus, Defendants possess information that will shed more light on the substantial risk of harm Plaintiffs face from Defendants' actions and the feasibility of redressing that harm.

The Martinez Defendant-Intervenors similarly jump the gun by arguing that there is no way to possibly redress Plaintiffs' harm. The Martinez Defendant-Intervenors assert that "very few records exist that provide data about an individual's undocumented immigrant status," and quote the *New York* Court's observation that "'the record is silent on which (and how many) aliens have administrative records that would allow the Secretary to avoid impermissible estimation, and whether the Census Bureau can even match the records in its possession to census data in a timely manner.'" (Doc. 209 at 13 (quoting *Trump,* 141 S. Ct. at 537)). But, again, the record is not complete here. Thus, Defendants and Defendant-Intervenors briefs show that discovery—not dismissal on an incomplete record—is warranted.

Finally, while "the census count has now been completed," (Doc. 193), the fact that the apportionment results have been repeatedly delayed shows that post-count and pre-apportionment operations continue. Defendants continue to develop the data that will form the apportionment, but since shortly before January 20, 2021, they have been doing so in a way that creates a significant risk of harm to Plaintiffs.[3] And since President Biden's Executive Order issued, there is no longer any question about what "[t]he Government's eventual action will" be. *Trump*, 141 S. Ct. at 536. There are no "legal [or] practical constraints" to implementing the Residence Rule. *Id.*

---

[3] Mike Schneider, *Census decision deals blow to Trump efforts on House seats*, Associated Press, Jan. 13, 2021, https://perma.cc/JC7Z-2TYF.

And thus there is nothing speculative about the nature of Plaintiffs' claims.  Plaintiffs should be given the chance to prove their standing and present the merits of their claims to the Court.

II. **An executive order confirming that Defendants will implement the Residence Rule does not moot Plaintiffs' claim.**

Defendants press an additional argument that appears to stand for the proposition that when a plaintiff challenges a federal agency's actions that are likely to harm the plaintiff, an executive order that instructs the agency to keep doing what it's doing will "effectively nullif[y]" the plaintiff's claim. (Doc. 207 at 12).  But this argument lacks any support in law or logic.  None of the cases Defendants cite support the notion that an executive order requiring an agency to continue implementing its long-planned course of action somehow supersedes that agency action or immunizes it from judicial review.  Nor would such a rule make sense.  An injunction binding the agency from acting under its rule would stymie the agency's attempts to implement the parallel executive order.  And allowing parallel executive orders to "nullify" challenges to agency rules would invite gamesmanship.  After all, if Plaintiffs amended their complaint to challenge President Biden's January 20, 2021 Executive Order, nothing would stop the President from simply issuing a copycat order to "nullify" the subsequent challenge.

Thus, the fact remains that, just as in past census cases, if Plaintiffs obtain a declaration "that any apportionment of the House of Representatives conducted pursuant to 2 U.S.C. § 2a by the Secretary of Commerce that does not use the best available methods to exclude illegal aliens from the apportionment base … would be unconstitutional," 1st Am. Compl. ¶144(b) (Doc. 112), then "it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision,"

6

*Utah v. Evans*, 536 U.S. 452, 460 (2002) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992)).

To the extent Defendants argue otherwise—and it does not appear that they really do, *see* Doc. 207 at 15 (noting that "Executive Order 13,986 may not entirely destroy redressability as a purely theoretical matter")—they run headlong into *Franklin v. Massachusetts* and *Utah v. Evans*. For while it was certainly true in *Franklin* that "the Secretary's report to the President … carries no direct consequences for the reapportionment," it is not true that an order against Defendants related to the Residence Rule would "not redress any alleged injury" because the Executive Order comes from the President. (Doc. 207 at 11–12 (quoting *Franklin*, 505 U.S. at 798)). After all, the *Franklin* Court ultimately held that plaintiffs' claims were redressable because it was "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." *Franklin*, 505 U.S. at 803. Thus, under controlling precedent, the Executive Order does not deprive this Court of jurisdiction to decide Plaintiffs' claims.

February 19, 2021

*/s/ Morris J. Brooks, Jr.*
Morris J. Brooks, Jr.
Pro se
2101 W. Clinton Avenue
Suite 302
Huntsville, AL 35805
(256) 355-9400
(256) 355-9406—Fax

*Counsel for Plaintiff*
*Morris J. Brooks, Jr.*

Respectfully submitted,

STEVE MARSHALL
*Alabama Attorney General*

BY:

*/s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.
*Solicitor General*

James W. Davis
Winfield J. Sinclair
Brenton M. Smith
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Post Office Box 300152
Montgomery, AL 36130-0152
Tel: (334) 242-7300
Fax: (334) 353-8440
Email: Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Win.Sinclair@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

**CERTIFICATE OF COUNSEL**

I certify, as an officer of the Court, that I have affirmatively and diligently sought to submit to the Court only those documents, factual allegations, and arguments that are material to the issues to be resolved in the motion, that careful consideration has been given to the contents of Plaintiffs' submission to ensure that it does not include vague language or an overly broad citation of evidence or misstatements of the law, and that the submission is non-frivolous in nature.

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
Solicitor General

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of February, 2021, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
Solicitor General